**UNITED STATES of America**

v.

**Wayne KLEIN and Nancy Thomas.**

**No. 88 CR 466.**

United States District Court, N.D. Illinois, E.D.

Dec. 28, 1988.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

On June 1, 1988, defendants Wayne Klein and Nancy Thomas were indicted for disobeying a court order issued on December 3, 1986, in violation of 18 U.S.C. § 401(3).[1] After pleading not guilty, both defendants challenged the sufficiency of the indictment on various grounds. The court denied defendants' motions to dismiss, finding that the criminal contempt charged met the minimal pleading requirements of Fed.R.Crim.P. 42(b). Because of the sparse allegations of the indictment,[2]

---

1. 18 U.S.C. § 401 provides in pertinent part:
   A court of the United States shall have power to punish by fine or imprisonment at its discretion, such contempt of its authority ... as—
   (3) Disobedience or resistance to its lawful writ, process, order, rule, decree or command.

2. After setting forth a bankruptcy order restraining the destruction or removal of documents and assets, the indictment alleges that defendants:
   ... willfully disobeyed the aforementioned lawful order of the court in that beginning on or about December 3, 1986 and continuing to this indictment, they caused documents and

the court granted most of Klein's requests for a bill of particulars as reasonably necessary to preparation of his defense. Memorandum Opinion and Order, August 17, 1988 at 4, 6 [available on WESTLAW, 1988 WL 89730 at 2].

A jury trial was conducted from September 20, 1988 to September 27, 1988. The jury found Klein guilty and acquitted Thomas.

Klein moves for arrest of judgment, pursuant to Fed.R.Crim.P. 34, and for acquittal notwithstanding the verdict, pursuant to Fed.R.Crim.P. 29. The parties have briefed these issues.

## MOTION IN ARREST OF JUDGMENT

Klein renews his challenge to the sufficiency of the indictment on the grounds that (1) it does not state facts sufficient to constitute an offense, (2) it does not allege the essential elements constituting criminal contempt, (3) he was not sufficiently apprised of the acts or events constituting the criminal contempt charged, and (4) the allegations of the indictment are so vague, indefinite and uncertain that the judgment of conviction does not protect him from future prosecution for the same offense.

In response, the government states that the indictment is adequate under Fed.R. Crim.P. 42(b) and that Klein's motion to arrest judgment is merely a "rehash" of his unsuccessful pretrial motion to dismiss.

The pleading requirements normally applicable to indictments under Fed.R.Crim.P. 7(c) do not apply to criminal contempts. Fed.R.Crim.P. 42(b) governs the sufficiency of criminal contempt charges. *United States v. Eichhorst*, 544 F.2d 1383, 1385 (7th Cir.1976). Rule 42(b) requires notice of "... the essential facts constituting the criminal contempt charged." In denying Klein's earlier motion to dismiss, the court found that:

> The challenged indictment advises Klein and Thomas of the essential conduct that is allegedly contemptuous: willful failure to obey a specific court order issued in a specific case beginning on a specific day.

records to be removed from the business premises of Klein Construction Company, and

Memorandum Opinion and Order, August 17, 1988 at 43. Nevertheless, Klein's contention that the indictment is deficient in several material respects requires further consideration and not the summary disposition suggested. Government's Consolidated Response at 9.

■ Klein asserts that the indictment is fatally defective because it does not allege an essential element of a criminal contempt offense: that he had knowledge of the order he allegedly disobeyed. Knowledge of the order violated is unquestionably an essential element of a criminal contempt offense. *United States v. Powers*, 629 F.2d 619, 627 (9th Cir.1980). Klein recognizes, however, that knowledge need not be explicitly pleaded, as long as "words of similar import" supply that required element. Motion in Arrest at 3; *United States v. Airdo*, 380 F.2d 103, 105 (7th Cir.1967); *United States v. Salliey*, 360 F.2d 699, 701 (4th Cir.1966).

The indictment is devoid of a specific allegation that Klein knew about or was aware of the order at issue. However, the indictment alleges that Klein "willfully disobeyed" the order. Read in the context of the indictment, the term "willfully" may be reasonably construed to supply the missing element. *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (a "willful" act is one done voluntarily and intentionally with the purpose of avoiding a known legal duty); *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) ("willful" construed to mean an act done with specific intent to violate the law); *United States v. Falk*, 605 F.2d 1005, 1010 (7th Cir.1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980) ("willful" means ... deliberately and intentionally; defendant must have known and specifically intended that his conduct violated the law).

■ Klein contends that the indictment is factually insufficient because it does not state the time when the order was entered, or the time he allegedly removed documents and records, or whether he re-

they failed to retrieve and return these documents and records....

moved documents on more than one occasion. Klein is charged with removal and failure to return documents and records in general and nonspecific terms beginning "on or about December 3, 1986" and continuing to his indictment a year and a half later. The indictment does not explicitly state that Klein's alleged document removal occurred *after* the order was entered, nor does it identify the documents and records removed.

Klein's contentions about the factual insufficiency and vagueness of the indictment would be more persuasive if Fed.R. Crim.P. 7(c) provided the governing standard. The indictment satisfies the "simple notice" requirement of Fed.R.Crim.P. 42(b) by quoting the order Klein allegedly disobeyed and—albeit in general terms—by describing the nature of his allegedly continuing violation. *United States v. Martinez*, 686 F.2d 334, 345 (5th Cir.1982); *United States v. Eichhorst*, 544 F.2d at 1385-86; *United States v. Partin*, 524 F.2d 992, 999 (5th Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976).

■ Klein argues that the indictment is deficient because the order described restrains Klein Construction Company and does not name Klein individually, the order does not state that Klein is subject to the jurisdiction of the bankruptcy court that issued the order, and there is no connection alleged between Klein and Klein Construction Company. This argument is specious. A court order directed to a corporation is in effect a command to those who are responsible for conducting its affairs. *Parker v. United States*, 126 F.2d 370 (1st Cir.1942). Either the corporation committing the contempt or the agent through whom it acts may be punished. *Wilson v. United States*, 221 U.S. 361, 376, 31 S.Ct. 538, 542, 55 L.Ed. 771 (1911); *N.L.R.B. v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir. 1984) (corporate officer who is responsible for corporation's affairs and for its disobedience may be held liable for contempt). One who knowingly participates or assists in the violation of a court order subjects himself to contempt proceedings. *Farber*

*v. Rizzo*, 363 F.Supp. 386 (E.D.Pa.1973); *Baltimore Transit Co. v. Flynn*, 50 F.Supp. 382 (D.Md.1943).

■ Finally, Klein asserts that the vagueness and ambiguity of the allegations in the indictment place him in jeopardy of further prosecution for the same offense. This argument is without merit. The indictment is sufficiently specific with respect to the order allegedly violated to preclude the government from prosecuting him again for disobeying the same order.

Klein's motion in arrest of judgment is denied.

## MOTION FOR ACQUITTAL NOTWITHSTANDING THE VERDICT

Klein asks this court to set aside the jury's verdict and to enter a judgment of acquittal. His motion is predicated upon the following contentions:

(1) The government did not present any evidence that he removed or caused the removal of any documents from Klein Construction Company after entry of the court order;

(2) The government failed to present any evidence that any documents are actually missing, or that Klein has or had possession of any documents removed from Klein Construction Company, other than those he turned over to his attorney the morning after he learned of the court order; and

(3) Viewing the evidence in a light most favorable to the government, no rational trier of fact could fairly have found him guilty of criminal contempt beyond a reasonable doubt.

In determining whether the evidence presented was sufficient to find Klein guilty beyond a reasonable doubt, this court must decide whether "any rational trier of fact, taking the evidence and all legitimate inferences in the prosecution's favor, could have thought the facts sufficient to show guilt beyond a reasonable doubt." *United States v. Sblendorio*, 830 F.2d 1382, 1386 (7th Cir.1987), *cert. denied*. — U.S. —, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). *See also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (the standard is "wheth-

er after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original). Issues arising from conflicting evidence and challenges to the credibility of witnesses must be resolved in the government's favor. *United States v. Roman*, 728 F.2d 846, 857 (7th Cir.1984).

## A. THE EVIDENCE

The issues Klein raises require a careful examination of the record. Evidence and inferences supporting the jury's verdict must be identified. Klein has cited to the record in his briefs. He asserts that the government's response to his motion,

> ... contains many overstatements and misstatements of the evidence before the jury, but does not delineate any evidence from which a rational juror could find beyond a reasonable doubt that Wayne Klein willfully and knowingly violated Judge DeWitt's order.

Klein Reply at 1. The government's responding brief does not contain a single citation to the record, and frequently fails to identify the evidentiary source for its conclusory statements and characterizations of the record.

The court has reviewed the record to identify evidence and rational inferences that support the jury's verdict.

### 1. *Background*

Wayne Klein and co-defendant Nancy Thomas were respectively president and secretary of Klein Construction Company ("the company"), a large general contracting firm primarily engaged in public contract work. Moelmann Tr. (A.M.) 3; O'Donovan Tr. 82.[3] In August 1986, the company filed a petition for reorganization under Chapter 11 of the Bankruptcy Act; the case was assigned to Judge Susan Pier-

son DeWitt of the bankruptcy court for this district. Moelmann Tr. (A.M.) 6. The company continued to conduct its business as a "debtor-in-possession;" Klein reported its activities periodically to Judge DeWitt. Moelmann Tr. (A.M.) 7–8.

### 2. *December 2, 1986*

During a hearing on December 2, 1986, at approximately 1:30 p.m., Lawrence Moelmann, an attorney for United States Fidelity & Guaranty Company ("USF & G"), presented a written motion requesting the appointment of a trustee for the company. Moelmann Tr. (A.M.) 9; Cooper Tr. 205. USF & G was the company's major creditor. Moelmann Tr. (A.M.) 5. Larry Cooper, an attorney representing the company in the bankruptcy proceeding, was present. Moelmann Tr. (A.M.) 9; Cooper Tr. 205. The hearing on the motion was continued to 4:00 p.m. that afternoon. Moelmann Tr. (A.M.) 10. At that time, a trustee was to be appointed and the company was to advise Judge DeWitt whether it would voluntarily convert its Chapter 11 reorganization proceeding to a liquidation proceeding under Chapter 7 of the Bankruptcy Act. Moelmann Tr. (A.M.) 11–12.

At the 4:00 p.m. hearing, Cooper asked that the matter be continued for 24 hours. Moelmann Tr. (A.M.) 13. Judge DeWitt granted the request and continued the hearing on appointment of a trustee until 4:00 p.m. the following day, December 3, 1986. *Id.*

Cooper met with Klein in the early evening of December 2, 1986. Cooper told Klein that Judge DeWitt said she had "lost confidence in the operation of the debtor" and she was going to appoint a trustee to take control of the company. Cooper Tr. 208, 210.[4] Cooper told Klein he did not know who the trustee would be. Cooper Tr. 211. Cooper explained that the trustee

---

**3.** "Tr." refers to the transcript of trial proceedings. "A.M." refers to Moelmann's testimony during the morning of September 21, 1988; "P.M." refers to his testimony that afternoon. The transcripts of the proceedings for the morning and afternoon sessions were not numbered in sequence.

**4.** The government states that Cooper told Klein that the bankruptcy judge's decision to appoint a trustee was "based on the evidence of diverted money." Government's Consolidated Response at 3. No evidence of diverted funds was presented in this case nor has Klein been charged with bankruptcy fraud. This statement is outside the record.

probably would take immediate possession of the company's office and records and that he would virtually close down the business. *Id.* Cooper warned Klein that the trustee might "ask for an immediate reference to the Justice Department" or hire accountants to audit the company's books. *Id.*

Klein gave Cooper conditional approval to consent to appointment of the trustee and liquidation proceedings, but he said that he wanted "to sleep on it." Cooper Tr. 212.

### 3. *December 3, 1986*

Klein was at the company's office by at least 8:30 a.m. on December 3, 1986, as were Thomas and several other employees. Reid Tr. 37. At approximately 9:00 a.m. and 10:00 a.m. Klein telephoned Jack Jepsen, Klein's neighbor and the owner of Jepsen Moving and Storage Company. Jepsen Tr. 14–16. Klein asked Jepsen to move some furniture from the company's office. Jepsen Tr. 16, 20. Delivery instructions were to be provided later by either Klein or Thomas. *Id.* Based upon his conversations with Klein, Jepsen estimated that the move would involve 20 four-drawer file cabinets, ten desks and 50 boxes. Jepsen Tr. 21.

Klein asked Gary Reid, a former employee, to rent some storage lockers. Reid Tr. 43. Klein gave Reid "several hundred dollars" in cash. *Id.* Reid rented lockers at two separate storage facilities that morning. *Id.* Klein remained at the office for only "a short while," and he did not return that day. DeRose Tr. 295–96.

That morning, contents of file cabinets located at the rear of the office were packed in white bankers' boxes and moved to the front of the office. Reid Tr. 38–40. Personal items of former employees, stationery and documents relating to the company's unsuccessful bids on projects were discarded and placed in a dumpster behind the office. Reid Tr. 39; O'Donovan Tr. 83–84; DeRose Tr. 297. Thomas gave packing instructions to company employees. DeRose Tr. 293, 295; O'Donovan Tr. 83–84.

At approximately 2:00 p.m., the Jepsen moving van arrived. Owen Tr. 104. Thomas instructed Jepsen personnel to move boxes, office furniture, desks and chairs. Owen Tr. 105. The mover estimated that there were approximately 20 boxes in the reception area at the front of the office and "five or ten" boxes elsewhere in the office. Owen Tr. 106–07. "Some" were brown Jepsen tote cartons. Tr. 107. Between 20 and 40 boxes were loaded onto the Jepsen truck; neither an inventory nor a count was made. Owen Tr. 112, 115; Gorney Tr. 401. Approximately 40 minutes after arrival (or 2:40 p.m.), the Jepsen truck left the company and took the boxes to Peppers Place, one of the two storage facilities rented by Reid that morning. Owen Tr. 116.

At approximately 2:00 p.m. or 2:30 p.m., Thomas asked Joe Ciraulo, Klein's brother-in-law, to take five or six boxes and some keys to Klein. Ciraulo Tr. 280–81. Ciraulo, who was remodeling a basement office, put away his tools, cleaned up and left the company between 3:15 p.m. and 3:30 p.m. Ciraulo Tr. 282. Ciraulo telephoned Klein around 4:00 p.m.; Ciraulo told Klein he had some boxes for him. Ciraulo Tr. 283–84. When Klein asked what they were, Ciraulo responded that he did not know. Ciraulo Tr. 284. Klein helped Ciraulo unload the boxes and asked Ciraulo to store the boxes overnight in his (Ciraulo's) garage. *Id.*

Sometime between 2:00 p.m. and 4:00 p.m., Thomas instructed company employees to stop packing and not to throw anything out because of a court order. DeRose Tr. 298; O'Donovan Tr. 99–100.

When the Jepsen moving crew returned to the company at approximately 3:00 p.m., Thomas informed them that they "weren't allowed to move any more cartons or any file cabinets. Anything containing paperwork." Owens Tr. 117–18, 128; Gorney Tr. 398. At approximately 3:45 p.m., a load consisting only of furniture was moved to The Hideaway, the other storage facility rented by Reid. Owen Tr. 118–19. The evidence thus established that Jepsen transported two loads from the company on December 3, 1986 at Thomas' direction: 20 to 40 boxes at approximately 2:40 p.m. de-

livered to Peppers Place, and furniture at approximately 3:45 p.m. delivered to The Hideaway.

### 4. The Bankruptcy Court Order

On December 3, 1986, at approximately 2:30 p.m., Moelmann (the attorney for USF & G) presented an oral *ex parte* motion to Judge DeWitt requesting a temporary restraining order against the company. Moelmann Tr. (A.M.) 18. Klein was not present, nor were any of his employees or any attorney for the company. *Id.* Cooper was notified of the hearing by telephone, but he did not appear. Moelmann Tr. (A.M.) 16–18.

Judge DeWitt granted the motion and entered the following verbal order:

I hereby order Klein Construction Company to cease and desist from destroying any of the Klein Construction Company property, included but not limited to books, documents, records, anything that would be under the custody and control of Klein Construction Company and further that they not remove any of the property from the premises or in any way tamper with those documents; further that they retrieve from the dumpster any and all documents, books, papers, writings that could have been put into that container today.

Judicial Notice of Proceedings Before Judge DeWitt.

Following the hearing, Moelmann telephoned Cooper and then called Thomas at the company from Judge DeWitt's outer chamber. Moelmann Tr. (A.M.) 21–22. Moelmann approximated his call to Cooper at 2:35 p.m. and his call to Thomas at 2:40 p.m. or 2:45 p.m. *Id.;* Moelmann Tr. (A.M.) 26; Moelmann Tr. (P.M.) 39. Moelmann advised Thomas of Judge DeWitt's order restraining "the removing of any documents of any kind or nature from the premises of Klein Construction Company." Moelmann Tr. (A.M.) 24. Moelmann also informed Thomas he had heard that documents had been removed from the company and placed in a dumpster outside. Moel-

mann Tr. (A.M.) 25. Thomas denied that records were thrown out; she said the files were just being reorganized. *Id.;* Moelmann Tr. (P.M.) 41.

Moelmann then prepared and presented a written temporary restraining order to Judge DeWitt at 4:00 p.m. that afternoon (the time scheduled for continued hearing on his motion for appointment of a trustee). Moelmann Tr. (P.M.) 4. After handwritten modifications were made by Moelmann, Judge DeWitt entered the written order at 4:30 p.m. that afternoon. The written order, as quoted in the indictment, provided:

(a) Klein Construction Company was restrained from destroying any records or documents of any kind in its possession;

(b) no documents, furniture, assets, or records of any kind were to be removed from the business premises of Klein Construction Company in Westmont, Illinois; and

(c) all documents and other assets removed from the business premises of Klein Construction Company within the last twenty-four hours were to be immediately retrieved and placed back on the business premises of Klein Construction Company.

The written order was broader than the oral order issued at 2:30 p.m. in several respects. The written order explicitly included "furniture and assets" and ordered that all documents and assets removed from the company's office "within the past twenty-four hours" were to be "immediately retrieved and placed back" on the company's premises. The oral order did not contain these provisions.[5]

### 5. Communication of the Bankruptcy Court Order to Klein

Klein was not present in court on December 3rd at either 2:30 p.m., when the oral order was issued, or 4:30 p.m., when the written order was entered. Nor was he at the company office that afternoon. Klein was served by mail with a copy of the

---

**5.** The written order did not contain the oral order's direction to retrieve documents from the dumpster.

order on approximately December 19, 1986. Moelmann Tr. (P.M.) 11–12. Moelmann had a special process server make personal service on Klein on December 21, 1986. Moelmann Tr. (P.M.) 31.

The only evidence offered by the government to establish that Klein was aware of the order on December 3, 1986, was Cooper's testimony. Before Cooper went to court at 4:00 p.m., he received a call from Klein, who sounded as if he were calling from his car telephone. Cooper Tr. 218. Cooper, who received notice of the order by telephone, told Klein that the judge "restrain[ed] anyone from taking any records out of the Klein Construction premises regardless of who they belonged to." Cooper Tr. 220.

Cooper was present at the 4:00 p.m. hearing to advise Judge DeWitt that the company agreed to voluntarily convert the reorganization proceeding to a liquidation proceeding. Moelmann Tr. (P.M.) 11; Cooper Tr. 221. Moelmann gave Cooper an unsigned, typed restraining order. *Id.* The judge later signed an amended version of the typed order prepared by Moelmann. Cooper Tr. 223.

Klein telephoned Cooper at approximately 6:30 p.m. that evening. Cooper Tr. 224. Cooper told Klein that his motion to voluntarily convert the bankruptcy proceeding to Chapter 7 was granted and a trustee had been appointed. Cooper Tr. 225. Cooper did not know the identity of the trustee. *Id.*

Cooper also told Klein that Moelmann stated at the hearing that on two separate occasions USF & G personnel observed a moving van being loaded with boxes at the Klein Construction premises. *Id.* Klein responded that only furniture was moved. Cooper Tr. 226. Cooper advised Klein that "there's now an order which has been entered which changes the order of the after-

noon." *Id.* Cooper explained that the restraining order was amended to include furniture and that "they were to bring back the books and records." *Id.*[6] Finally, Cooper told Klein that late that night or the next morning the locks probably would be changed and the business would be closed down. *Id.* Cooper never provided Klein or Thomas with a copy of the temporary restraining order, nor did he read the order over the telephone to either of them. Cooper Tr. 251, 226.

### 6. *Recovery of the Records*

The trustee was notified of his appointment by telephone at approximately 4:00 p.m. on December 3, 1986. DeMars Tr. 141. The trustee retained a liquidating service to take possession of Klein Construction Company and to change the door locks that afternoon. *Id.* This was accomplished by 7:00 p.m. on December 3rd. At that time, the liquidator found 91 boxes of records and 32 boxes of blueprints in the company's offices. DeMars Tr. 142, 144. The trustee did not examine or inventory these records, but had the liquidator turn them over to Moelmann's law firm the following day. DeMars Tr. 161, 163; Moelmann Tr. (P.M.) 28.[7]

The following morning, Klein turned five or six boxes of records over to an attorney who handled litigation for the company, Don Johnson. DeRose Tr. 299; Johnson Tr. 378, 382–83. The boxes contained records relating to litigation that the company initiated against the City of Chicago for work done on a construction project at O'Hare Airport. *Id.* Johnson was handling that litigation, and he had possession of a substantial number of other O'Hare project records provided by the company over a period of time. Johnson Tr. 379–80, 385. When another attorney was appointed to replace him in 1987, Johnson turned

---

**6.** Without citation to the record, the government states that Cooper testified he told Klein that "anything removed had to be returned immediately." Government's Consolidated Response at 7. This misstates the record. Cooper did not testify that the order required Klein to return *immediately* all records removed from Klein Construction during the previous 24 hours, nor did Cooper tell Klein that removed records must be delivered to the trustee. In fact, Cooper told Klein that he did not even know the name of the trustee. Cooper Tr. 225.

**7.** Moelmann's on site employees also retrieved "some things" from the dumpster. Moelmann Tr. (P.M.) 49.

the O'Hare litigation records over to the trustee. Johnson Tr. 383, 387, 390. The trustee turned the records over to Moelmann's firm upon its appointment by the bankruptcy court on May 27, 1987. De-Mars Tr. 159–160.

The trustee received keys to the storage lockers (rented by Reid) from Johnson on December 9, 1986. DeMars Tr. 145. The trustee gave these keys to the liquidator on December 11, 1986. DeMars Tr. 148. On December 12, 14 or 15, 1986, the liquidator picked up 19 boxes of records and office furniture from the two storage facilities and placed this property in yet another storage warehouse used by the liquidator. DeMars Tr. 157; R. Johnson Tr. 170. The records were not examined at that time. R. Johnson Tr. 171. The liquidator also stored "some" boxes retrieved directly from the company's offices at the same storage warehouse. R. Johnson Tr. 173, 179.

Approximately a month later, a lawyer from Moelmann's firm accompanied an employee of the liquidator to the storage warehouse; they put blue or green dots on 19 bankers' boxes that the liquidator identified as having come from one of the storage facilities rented by Reid (Peppers Place). Mrozek Tr. 313; R. Johnson Tr. 183. The lawyer tagging the boxes did not examine their contents. *Id.*

A year later, two FBI agents went to the storage warehouse used by the liquidator and picked up approximately "45 to 50 boxes" of Klein Construction Company and Klein Corporation documents. Showers Tr. 192. The FBI agents delivered these boxes to Moelmann's office. Showers Tr. 193. The FBI agents counted 18 boxes bearing blue dots; all were white bankers' boxes. Showers Tr. 196–98. The count was taken at Moelmann's office because the storage warehouse was unlighted and the FBI agents "couldn't see very well back in the areas where the boxes were being stored." Showers Tr. 201.[8] The FBI agents apparently did not examine the contents of the boxes at that time.

Moelmann has never counted the boxes of Klein Construction records stored in two rooms of his firm's offices. Moelmann Tr. (P.M.) 31. He did not examine the boxes delivered to his office by the trustee, the liquidator or the FBI, nor could he identify any missing boxes. Moelmann Tr. (P.M.) 47–48.

Moelmann testified that he has not been able to locate some records relating to the O'Hare project and the company's bank accounts. Moelmann Tr. (P.M.) 50–51. Moelmann unsuccessfully attempted to obtain the missing records through the company's attorneys and "court process" prior to December 3, 1986. Moelmann Tr. (P.M.) 54.

## B. THE ISSUES

The government argues that the evidence was sufficient to establish that Klein violated the bankruptcy court's order in the following ways:

[1] ... by removing the twenty to forty boxes through Nancy Thomas with the Jepsen movers,

[2] by removing the additional five or six boxes Joseph Ciraulo brought to [Klein],

[3] by failing to return immediately the boxes he received from Ciraulo,

[4] by failing to return immediately the keys to Pepper Place and the nineteen boxes that were ultimately recovered from that storage facility, and

[5] by continuing not to return the additional boxes of records moved to Pepper Place but never recovered by the trustee.

Government's Consolidated Response at 8–9. Careful examination of the record, however, reveals there is insufficient evidence to support a finding of guilt beyond a reasonable doubt on any of the asserted violations of the court order.

### 1. *Removal of 20 to 40 Boxes from the Company's Offices by Jepsen*

■ In order to conclude that Klein willfully disobeyed the court order by the stor-

---

**8.** The 19 boxes allegedly tagged by the liquidator and the lawyer from Moelmann's office were stored in the well-lit *front* of the warehouse a year earlier. R. Johnson Tr. 178.

age of 20 to 40 boxes of records at Thomas' direction, it is necessary to find that (1) Thomas knew about the 2:30 p.m. verbal restraining order before the Jepsen moving van departed at approximately 2:40 p.m., (2) Thomas contacted Klein before 2:40 p.m. and told him about the 2:30 order, and (3) Klein instructed Thomas to disobey the order by directing the movement of the boxes to a storage facility. Drawing all reasonable inferences in the government's favor, substantial doubt remains concerning these essential factors.

Timing and notice are critical in this case. Yet most of the significant events occurred at times only approximated by the witnesses. Thomas was notified of the 2:30 order by telephone at approximately 2:40 or 2:45 p.m. Moelmann Tr. (P.M.) 39–40. The Jepsen moving van departed with 20 to 40 boxes at approximately 2:40 p.m. Owen Tr. 116. Based upon this record, a rational and fair trier-of-fact should entertain some doubt that Thomas knew about the 2:30 order and intended to disobey it when she told the movers to deliver the boxes to a storage facility. The doubt that Thomas intended to disobey the court order becomes substantial when considered in light of undisputed evidence that during the afternoon, she instructed employees to stop packing records because of a court order. DeRose Tr. 298; O'Donovan Tr. 99–100. Furthermore, at approximately 3:00 p.m., when the movers returned for the second load, Thomas told them that only furniture could be moved. Owen Tr. 117–18, 128; Gorney Tr. 398. The fact that 91 boxes of records and 32 boxes of blueprints were found in the company's offices when the trustee took possession that evening also raises doubt that Thomas was acting in defiance of the court order at most only moments after it was verbally issued.[9]

Even assuming that Thomas received telephone notice of the order before the movers left and that she nevertheless gave them delivery instructions, the record does not establish Klein's participation in the violation. The government contends that an inference must be drawn that Thomas talked to Klein after the order was entered

and before 4:00 p.m. Government's Consolidated Response at 6. This inference is based upon Cooper's testimony that he told Thomas he needed to speak to Klein before the 4:00 p.m. hearing; Klein called Cooper before 4:00 p.m. The inference that Thomas located Klein before 4:00 p.m. and gave him Cooper's message is a reasonable one. However, that inference standing alone cannot rationally be stretched to establish beyond a reasonable doubt that Thomas located and talked to Klein moments after she received telephone notice of the order and that Klein then instructed her to disobey the order. That conclusion would require impermissible speculation not founded on evidence or reasonable inferences drawn from the evidence.

### 2. Removal of Five or Six Boxes by Joseph Ciraulo

■ Since Thomas asked Ciraulo to deliver five or six boxes to Klein between 2:00 p.m. and 2:30 p.m. (Ciraulo Tr. 280–81), it cannot be seriously argued that she made these arrangements in violation of the 2:30 order. Ciraulo was remodeling an office in the basement of the company's office building. He did not leave the company until he cleaned up and put his tools away at about 3:15 p.m. or 3:30 p.m. Ciraulo Tr. 282. The record does not establish that Ciraulo had any further contact with Thomas after she made the request (before the order was issued), or that she knew he had not left yet or had an opportunity to stop him from taking the boxes after she learned of the order. Nor is there any basis in the evidence to support a finding beyond a reasonable doubt that Thomas acted at Klein's direction in failing to countermand the Ciraulo delivery. To the contrary, Ciraulo testified that when he called Klein at home later, he told Klein that he had some boxes Thomas asked him to deliver. Klein responded by asking what they were. Ciraulo Tr. 284.

### 3. Failure to "Immediately" Return the Boxes and Keys Delivered by Ciraulo

■ The government argues that Klein willfully disobeyed the order by not re-

---

9. Indeed, the jury acquitted Thomas of willfully     disobeying the court order.

turning "immediately" the boxes and keys that Ciraulo delivered to him at approximately 4:00 p.m. However, the provision requiring "immediate" return of all records removed from the company's offices was not part of the 2:30 verbal order. The "immediate return" provision was added in the written order issued at 4:30 p.m.

The "immediate return" requirement was not part of the order when Ciraulo delivered the boxes to Klein. Cooper first advised Klein of the 4:30 order at approximately 6:30 p.m. that evening; Cooper failed to mention the "immediate return" provision of the order. Cooper Tr. 226. By 7:00 p.m., Klein no longer had access to company offices. DeMars Tr. 153. By the time Klein received a copy of the written order two weeks later (Moelmann Tr. (P.M.) 11–12, 31), he had turned the boxes and keys over to Johnson, the attorney handling civil litigation for the company.

Given the casual and dilatory conveyance of notice of the order, Klein's conduct in turning over the keys and records to Johnson was reasonable and cannot be deemed contumacious. The records Ciraulo delivered to Klein pertained to the O'Hare litigation Johnson had been handling. It was not unreasonable for Klein, a non-lawyer, to turn these records over to the responsible company attorney. Klein did not know the identity of the trustee. Cooper Tr. 225. Within a reasonable time, Johnson was in contact with the trustee. Johnson turned the keys over to the trustee before Klein was even served with notice of the order. DeMars Tr. 145, 150. Johnson's successor (Moelmann) was not appointed by the bankruptcy court until six months later. *Id.* 159–60.

There is insufficient evidence to support a finding that Klein knowingly and willfully violated the order by turning records and keys over to a company attorney who, in turn, delivered them to the trustee.

#### 4. *The Failure to Return Missing Records*

■ The evidence regarding records recovered directly from the company office and from the storage facilities is vague and indefinite. The only testimony concerning the number of boxes removed by Jepsen was a rough estimate (20 to 40 boxes) or "guess." Owen Tr. 106–07. No count or inventory was made. *Id.* The mover testified that the load included both white bankers' boxes and brown Jepsen boxes. *Id.*[10] These boxes were in the custody of the liquidator for a month before they were marked to distinguish them from an unspecified number of white and brown boxes removed from the company's offices after the trustee took possession. The contents of the boxes were not examined during the year they were in the liquidator's storage warehouse. The FBI agents could find only 18 of the 19 boxes marked by the liquidator. The missing marked box was in the liquidator's custody when it disappeared or was misplaced. The evidence suggests that the boxes were moved within the storage warehouse during the year they were stored there. *Compare* Snow Tr. 201 to R. Johnson Tr. 178. There was no evidence that the FBI examined the contents of the boxes or determined that records were missing. Moelmann admitted that he never examined the more than 150 boxes of company records in his law firm's possession; he was unable to identify any missing boxes. Moelmann Tr. (P.M.) 48.

Against this backdrop, Moelmann's testimony that he has been unable to locate certain specific records, missing prior to the court order, is of little probative value. No evidence was offered to support the government's theory that specific missing records were on the company's premises when the order was entered or that any specific missing records were under Klein's control after entry of the order.

The record contains insufficient evidence to support a finding that, beyond a reasonable doubt, Klein continues to disobey the court order by not returning missing documents.

### CONCLUSION

The contempt power is an historic device used by the judiciary to command obedi-

---

**10.** The government argues that the absence of any brown Jepsen boxes from the 18 boxes moved from the storage warehouse by the FBI is proof that there are missing boxes.

ence to court orders and to vindicate the court's authority. Great discretion is afforded the judiciary in punishing persons adjudged guilty of criminal contempt. Unlike all other federal offenses, Congress has not set a maximum period of imprisonment for criminal contempt. History teaches that the contempt power should be exercised with restraint. The order violated must be clear and definite, its terms must be unequivocally communicated, and the conduct violative of the order must clearly demonstrate that the violator knew of the order and willfully disobeyed it.

This case arises from an oral *ex parte* motion for a temporary restraining order made by a creditor in a bankruptcy proceeding. The written order issued several hours later was drafted by that interested party. The order was not served on Klein until two to three weeks after it was entered, despite its purported urgency. Klein was first notified of the order in a casual and indirect manner that leaves substantial doubt as to what he was told and when he became fully aware of all the terms of the order.

The evidence that Klein knowingly and willfully violated the court order is dependent upon inferences impermissibly mixed with speculation. A rational jury could not find Klein guilty beyond a reasonable doubt based on the evidence presented in this case.

For these reasons, defendant Wayne Klein's motion for acquittal notwithstanding the verdict is granted and his motion in arrest of judgment is denied.

Judgment is entered accordingly.