**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Wayne KLEIN, Defendant–Appellee.**

**No. 89–2213.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1990.

Decided Aug. 24, 1990.

---

Stephen Heinze, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellant.

William A. Barnett, Decker & Associates, Chicago, Ill., for defendant-appellee.

Before POSNER and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Wayne Klein was indicted along with a co-defendant, Nancy Thomas, for willfully disobeying a bankruptcy court order by causing documents and records to be removed from the premises of Mr. Klein's business, Klein Construction Company, and by failing to retrieve and return those documents, in violation of 18 U.S.C. § 401(3). After a trial, a jury found Mr. Klein guilty and acquitted Ms. Thomas. The district judge concluded that the evidence was insufficient to find beyond a reasonable doubt that Mr. Klein knew of the court order when he caused removal of the records, that he disobeyed the order in delaying return of the records he did return, or that there are some records which he has never returned. *United States v. Klein*, 94 B.R. 982 (N.D.Ill.1988). The government appeals.

■ Our jurisdiction is based on 18 U.S.C. § 3731. Although this provision does not specify a post-verdict judgment of acquittal as an appealable judgment, it has been construed to permit such an appeal if, as here, a reversal will not cause a violation of the Double Jeopardy Clause. *United States v. Jenkins*, 420 U.S. 358, 365, 95 S.Ct. 1006, 1010, 43 L.Ed.2d 250 (1975) (dicta); *United States v. Blasco*, 581 F.2d 681, 683–84 (7th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *United States v. T. Allison*, 555 F.2d 1385, 1387 (7th Cir.1977). *See United States v. Wilson*, 420 U.S. 332, 337, 95 S.Ct. 1013, 1018, 43 L.Ed.2d 232 (1975).

## THE FACTS [1]

A rather detailed examination of the evidence is necessary, since we must determine whether the evidence, including circumstantial evidence and fair inferences, supports the jury's guilty verdict upon any theory.

Mr. Klein was the president and owner of Klein Construction Company ("KCC"). In August, 1986, KCC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The company continued as debtor-in-possession, with Mr. Klein periodically filing reports to the bankruptcy court.

During a hearing on Tuesday, December 2, 1986, one of KCC's largest creditors asked the court to appoint a trustee to assume the management of KCC's affairs. The bankruptcy judge indicated her intention to do so, but upon the request of KCC's attorney, the matter was continued until 4:00 p.m. the next day, so that he could discuss with Mr. Klein whether voluntarily to convert the Chapter 11 reorganization into a Chapter 7 liquidation.

KCC's attorney, Larry Cooper, met with Mr. Klein that evening. He had told Mr. Klein earlier in the day that the bankruptcy judge had "lost confidence in the operation of the debtor" and was going to appoint a trustee to take control of the company. Tr. 208. At the evening meeting, Mr. Cooper reiterated that "the judge was very adamant about appointing a trustee and not letting this business be run by its principal." Tr. 210. He told Mr. Klein that the appointment of a trustee was inevitable, although he did not know whom the bankruptcy judge would appoint. Mr. Cooper explained that the first thing the trustee would do would be change the locks on the office doors, and then the trustee would "take possession of the checkbooks and records—anything he can get his hands on." He told Mr. Klein that the trustee "would virtually close the business down; and based on the history of the case, he would either ask for an immediate reference to the Justice Department" or "hire the best accountants he could possibly hire to get in and start reviewing records." Tr. 211.

Mr. Klein indicated to Mr. Cooper he understood his business was "through." Tr. 212. He gave conditional approval to consent to voluntary conversion of the bankruptcy case to Chapter 7 liquidation, saying he wanted to sleep on it, but that if Mr. Cooper didn't hear from him, he could go ahead and consent. *Id.*

When KCC employees arrived at work the next morning, Wednesday, December 3, things had been moved around in the office. Tr. 292. Boxes had been placed here and there on the floor, and file cabinets containing KCC financial and bank records and construction project documents had been moved from the accounting department in the rear of the office area up into Mr. Klein's office. Tr. 72–74, 85, 292.

At about 9:00 and 10:00 a.m. that morning, Mr. Klein called Jack Jepsen, a neighbor of his who owned Jepsen Moving and Storage Company. He asked Mr. Jepsen if his company could move furniture and boxes for him that day. Although this was short notice, Mr. Jepsen said his company

---

1. This statement of facts is derived from the district court's opinion, with additions from the record where noted. Most of the transcript is contained in volumes with consecutive volume and page numbers, referred to here as "Tr."

Three of the volumes for September 21, 1988 are labelled "Excerpts" and their pages are numbered independently, two of which are referred to in this opinion: the 11:45 a.m. volume ("Ex. A.M.") and the 1:30 p.m. volume ("Ex. P.M.").

could do it. Tr. 17. Based on his conversation with Mr. Klein, Mr. Jepsen estimated the move would involve 20 file cabinets, ten desks and 50 boxes.

Mr. Klein also asked Gary Reid, a former employee of KCC who was at the office that day, to rent some space to store excess furniture, and gave him several hundred dollars in cash for this purpose. Mr. Reid rented storage units 11 and 13 at Pepper's Place in Westmont. Tr. 43. He rented these lockers under his own name, but wrote on the lease agreements "Wayne Klein has my permission to enter this unit." Tr. 54–55. He received a single key for each unit. Tr. 43. He rented a third storage unit at a different place, The Hideaway, and then returned to the KCC office, and gave the keys to the office manager, Ms. Thomas. Tr. 47.

Meanwhile, Mr. Klein had left the office, not to return that day. Under directions of Ms. Thomas, KCC employees, with Mr. Reid helping when he returned, packed up much of the office. They packed documents and records into white banker's boxes which the company apparently had on hand, and later into cartons supplied by the movers. Personal items of former employees and stationery were thrown out, along with documents relating to the company's unsuccessful bids on projects. This discarded material ended up in a dumpster behind the office. The boxes which were packed were moved from the rear of the office to the front, into Mr. Klein's office. Tr. 91.

The Jepsen movers arrived in a 30–foot van at approximately 2:00 p.m. Tr. 104. One of the movers, Vince Owen, talked with Ms. Thomas, who showed him what was to be moved—boxes, office furniture, desks, and chairs. Tr. 105. Mr. Owen noticed that there were boxes "throughout" the office, although most were located near the entrance, in what he called the reception area. *Id.* The movers had brought with them a bundle of 125 flattened, brown tote cartons with Jepsen's logo printed on them. Tr. 108. Mr. Owen showed Ms. Thomas how to put them to-

gether. *Id.* KCC was later charged for 58 of these tote cartons. Tr. 24–26.

The movers began loading the truck with boxes. Approximately 40 minutes after they arrived, Ms. Thomas told them to take what had been loaded so far to the storage units at Pepper's Place. Tr. 116–17. Very little of the 30–foot van was filled at this point. Ms. Thomas said that the rest would be moved to a different storage unit. *Id.* The movers did not inventory the load or count the number of boxes. Mr. Owen estimated at trial the load contained 20 or 30 boxes, but had earlier estimated 30 or 40. Tr. 112. Some of the boxes were white bankers boxes, and some were brown Jepsen tote cartons. Tr. 115, 401. The movers drove the load to Pepper's Place, and put the boxes in one of the storage units. Tr. 118. These boxes did not fill up that unit, and the other remained empty. *Id.*

Mr. Klein's brother-in-law and neighbor, Joe Ciraulo, was remodelling a small office in the basement of the KCC premises that day. Tr. 272–73. At approximately 2:00 or 2:30 p.m., he came upstairs. Mr. Reid gave him the money that was left over from renting the storage units, and asked him to return it to Mr. Klein. Tr. 280. Then Ms. Thomas asked Mr. Ciraulo to take two keys and five or six boxes to Mr. Klein. Tr. 281. Mr. Ciraulo loaded the boxes in his car, and went downstairs to pack away his tools and clean up. *Id.* He left with the keys and boxes between 3:15 and 3:30 p.m. He arrived home at about 4:00 p.m., and called Mr. Klein to tell him about the boxes. Mr. Klein asked what they were, and came right over. Mr. Klein helped unload the boxes into Mr. Ciraulo's garage to store them overnight, saying "I'm just going to turn them over." Tr. 284. Mr. Ciraulo handed over the keys and money at this time. Tr. 289.

Sometime in the afternoon of December 3 (one witness estimated between 2:00 and 4:00 p.m.), Ms. Thomas told the employees that a court order had been issued, and they were not to throw anything away or destroy anything. Tr. 100. One witness testified that Ms. Thomas said to stop pack-

ing; another said the packing continued. Tr. 100, 298. When the movers returned at about 3:00 p.m. from their first trip, Ms. Thomas told them they weren't to move any more paperwork. Tr. 118. They took a load of furniture to The Hideaway. Thus, documents shown to have been removed from the KCC offices on December 3 were the unsuccessful bid papers thrown into the dumpster, the load of boxes taken to Pepper's Place, and the five or six boxes taken away by Mr. Ciraulo.

Meanwhile that same afternoon, Lawrence Moelmann, an attorney for one of KCC's creditors, appeared before the bankruptcy judge and orally requested a temporary restraining order against the company. The judge issued the following oral order at 2:30 p.m:

> I hereby order Klein Construction Company to cease and desist from destroying any of the Klein Construction Company property, included but not limited to books, documents, records, anything that would be under the custody and control of Klein Construction Company and further that they not remove any property from the premises or in any way tamper with those documents; further that they retrieve from the dumpster any and all documents, books, papers, writings that could have been put in that container today.

Mr. Moelmann called KCC's lawyer, Mr. Cooper, at about 2:35 p.m., from the bankruptcy judge's outer chambers. Ex. A.M. 22. The record does not reflect what Mr. Moelmann told Mr. Cooper during this call, because the district court sustained an objection to the testimony. Mr. Moelmann then called the KCC offices, at about 2:40 or 2:45 p.m. He reached Ms. Thomas, and told her first that he had just spoken to Mr. Cooper, who knew he would be making this call. Ex. A.M. 23–24. He told her that the bankruptcy judge had just entered an order "restraining the removing of any documents of any kind or nature from the premises of Klein Construction Company at 801 N. Cass Avenue." Ex. A.M. 24. He said that anything that had been removed from the business premises had to be retrieved. Ex. P.M. 41. She said no doc-

uments had been removed from the premises, and that they were merely reorganizing their files. Ex. A.M. 25. Mr. Moelmann told her that he had heard documents were being put in the dumpster out back. Ms. Thomas answered something like "You don't expect me to go into that dirty dumpster and get those documents back." Ex. P.M. 26. This conversation evidently occurred very close to the time that Ms. Thomas directed the movers to move the partial load, and directed Mr. Ciraulo to take the keys and boxes to Klein.

Sometime later, but before 4:00 p.m., Mr. Klein called Mr. Cooper at his law offices, from what sounded like a car telephone. Tr. 218. Mr. Cooper told Mr. Klein that there was an order "restraining anyone from taking any records out of the Klein Construction premises regardless of who they belonged to." Tr. 220. He said the judge wanted Mr. Klein in the courtroom at 4:00 p.m., and that if he appeared, Mr. Cooper predicted "there will be some marshals" there. Tr. 219. Mr. Klein replied "maybe this conversation didn't take place." *Id.*

At 4:30 p.m., with Mr. Cooper but not Mr. Klein present, the bankruptcy judge entered a written order which restrained the removal or destruction of any documents in KCC's possession. It also prohibited the removal of any documents, records or assets of any kind from the company's premises, and required all documents and other assets which had been removed in the last twenty-four hours to be immediately retrieved and placed back on the premises of Klein Construction Company.

Mr. Klein learned of this order when he called Mr. Cooper at 6:30 p.m. on that day, although he did not receive a copy of it until more than two weeks later. Mr. Cooper, who had a copy of the order but didn't read it to Mr. Klein, first told him during this call that the bankruptcy judge had converted the case to a Chapter 7 liquidation and appointed a trustee, although Mr. Cooper did not know who the trustee was. Tr. 225. He said that an attorney for a creditor of KCC had told the judge

that observers had seen boxes being moved into a big moving van at the KCC premises. *Id.* Mr. Cooper told Mr. Klein "there was a lot to do about the fact that this violated the order." *Id.* Mr. Klein replied that "they were only moving some furniture," to which Mr. Cooper responded "Wayne, it's boxes, not furniture." Tr. 225–26. Mr. Klein explained that "No, these are boxes that you put furniture into, then you lift them onto the truck." Tr. 226. Mr. Cooper went on to say "there's now an order which changes the order of the afternoon," that "they were to bring back the books and records," and that the order now prohibited the taking out of any furniture—"that you couldn't take a pencil out of that place without being in violation of the order." *Id.* He predicted that the locks would be changed late that night or the next morning. *Id.*

The trustee was notified of his appointment at about 4:00 p.m. on December 3, 1986. He hired a liquidating service to take possession of the company and to change the door locks, which was done by 7:00 p.m. A large number of boxes of records and blueprints remained in the KCC offices. Some things were retrieved from the dumpster. The records recovered from the KCC offices were not examined or inventoried by the liquidator or trustee, but were turned over to Mr. Moelmann's law firm the next day.

On Thursday morning, December 4, Mr. Klein turned over the boxes of records which had been stored in Mr. Ciraulo's garage to an attorney who was representing KCC in lawsuits the company had filed against the City of Chicago over an O'Hare Airport construction project. The records pertained to this litigation, and the attorney, Don Johnson, also was holding a substantial number of other KCC records regarding these lawsuits. Mr. Johnson did not turn over the contents of these five or six boxes to the trustee until sometime in the first half of 1987. Tr. 387.

On Tuesday, December 9, 1986, Mr. Johnson delivered two keys to the trustee—the key to Pepper's Place storage unit 11, and the key to the Hideaway unit. Tr.

145. On December 12, employees of the liquidator retrieved 19 standard record-sized boxes of documents from Pepper's Place storage unit 11, and took them to a warehouse, where the other records recovered from KCC were located. Tr. 171. These 19 boxes were kept separate from the others. The key to Pepper's Place storage unit 13 was turned over by Mr. Johnson on Tuesday, December 16, and the unit was found to be empty. Tr. 148–151, 158. The record shows that Mr. Klein had the keys at least until Monday, December 8, when he met Mr. Reid at Pepper's Place to change the leases over to his own name, but it does not show when he gave them to Mr. Johnson, or whether the keys to unit 11 and unit 13 were given to Mr. Johnson at the same time.

In January 1987, a lawyer from Mr. Moelmann's firm met with one of the liquidator's employees at the warehouse the liquidator had stored the documents recovered from KCC. They marked the boxes which had been retrieved from storage unit 11 at Pepper's Place with circular stickers, and prepared a list. A year after that, FBI agents picked up approximately 45 to 50 boxes of records from this location, and delivered them to Mr. Moelmann's office. The agents counted 18 boxes with circular stickers on them, each a white banker's box.

## DISCUSSION

■■■■ A district court should grant a motion for acquittal when the relevant evidence, viewed in the light most favorable to the government, is insufficient for a rational juror to find guilt beyond a reasonable doubt. *E.g., United States v. Reed,* 875 F.2d 107, 111 (7th Cir.1989). It is the jury's exclusive function to evaluate the credibility of witnesses, resolve conflicts in evidence, and draw reasonable inferences from the evidence presented. *Id.* When determining what inferences a juror may permissibly draw from the evidence presented, a reviewing court should consider the entire background behind the case, without viewing individual pieces of evidence in isolation. *See United States v.*

*Greyhound Corporation,* 508 F.2d 529, 532 (7th Cir.1974).

The government argues that it proved Mr. Klein disobeyed the bankruptcy court's order by (1) causing the removal of the documents loaded onto the moving van, and the documents delivered to him by Mr. Ciraulo, (2) failing to return the Ciraulo documents and the Pepper's Place storage unit keys in a timely manner, and (3) continuing to fail to return some of the documents which were removed from the KCC premises on December 3, 1986.

Judge Conlon granted the defendant's post-trial motion for acquittal. She held that based on the evidence presented, a reasonable juror could not conclude beyond a reasonable doubt, that Mr. Klein violated the bankruptcy court orders in any of the ways posited by the government. 94 B.R. at 991–92.

The government's first argument rests upon the theory that Ms. Thomas learned of the oral order, within a very few minutes relayed that information to Mr. Klein, and was directed by him to remove the records already in the van, or those to be delivered by Mr. Ciraulo, all before the records left the premises. This sequence of events is possible under the evidence, but it is difficult to identify reasonable inferences to support a finding beyond a reasonable doubt that it occurred. We do not decide this close question.

■ As to the government's second argument, it is true, as noted by Judge Conlon, that when Mr. Klein was told of the written order at about 6:30 p.m. on Wednesday, December 3, he may not have been told the order to return the documents said "immediately." It is also true that the locks were changed on the premises at about 7:00 p.m., and that Mr. Klein did not know the identity of the trustee who had just been appointed. We note, however, that Mr. Klein could readily have ascertained the identity of the trustee and delivered the records (or at least the storage keys) to the trustee, or, with his assistance, to the KCC premises. He had learned at least by about 4:00 p.m. that the records had been removed in violation (perhaps unwitting) of the court order. It is our view that even without knowledge of the court's use of the term "immediately," Mr. Klein must have known that the order required prompt compliance, and the jury could find, beyond a reasonable doubt, that his delay was willful disobedience of the order.

■ As to the government's third argument, we conclude that there was sufficient evidence to support a finding, beyond a reasonable doubt, that some of the records were never returned, and that this was willful disobedience.

Our conclusion is founded upon three bases: First, the jury fairly could conclude that more boxes of documents went into one of the Pepper's Place storage units than were recovered from unit 11. Second, the evidence showed that Mr. Klein had sole access to the storage units for almost six days after the documents were moved into one of them. He may have retained the key to one of the units for almost 14 days. Third, the evidence showed that Mr. Klein, after learning that a trustee was to be appointed over his company, hastily took steps to ensure his control over documents and assets of the company, and otherwise indicated an intent to frustrate or delay the trustee's access to company records. Based on the evidence introduced, a rational juror could conclude beyond a reasonable doubt that Mr. Klein (or someone acting on his behalf) removed documents from the Pepper's Place storage unit and has not returned them.

Mr. Owen, the Jepsen mover, testified at trial that 20 to 30 boxes of documents were loaded into the van on December 3, and taken to Pepper's Place. The jury also learned that less than a month after the move, Mr. Owen had made a somewhat higher estimate, under oath, of the number of boxes moved—"About 40. 30 or 40." Tr. 115. The boxes were not inventoried, but even the lowest estimate was one box greater than the number of boxes recovered, and the jury could rationally conclude that the estimate Mr. Owen made closer to the time of the event was more accurate.

Other evidence supports a conclusion that some documents have disappeared. Mr. Owen testified that *brown* Jepsen tote cartons as well as *white* banker's boxes were moved into the Pepper's Place storage unit on December 3. Eighteen of nineteen boxes identified as those recovered from the storage unit were white banker's boxes; none was a brown box.[2] Not much time passed between the movers' arrival at the offices at around 2:00 p.m. on December 3 and their departure with the load of boxes at about 2:40. The brown tote cartons had been brought by the movers, but the jury could reasonably believe that forty minutes is enough time to assemble, fill and load a number of boxes onto the moving van.

Finally, Mr. Moelmann testified at trial that he has not been able to locate some records relating to the O'Hare projects and a KCC bank account. Ex. P.M. 50–51.

The evidence also shows that Mr. Klein had sole access to the Pepper's Place storage units for a period of time after the boxes of documents were moved there. Mr. Ciraulo gave him the keys to the units on the afternoon of December 3. Mr. Klein had the keys at least until December 8, when he and Mr. Reid met at Pepper's Place to put Mr. Klein's name on the leases, and opened the storage units. The key to unit 11 was not turned over to the trustee (by Mr. Johnson) until Tuesday, December 9, and the key to unit 13 not until the next Tuesday, December 16.

Additionally, the record contains ample evidence which makes a conclusion that Mr. Klein had the intent to, and did in fact retain or cause other disposition of some of the documents a reasonable one.

Mr. Klein's original decision and arrangements for moving documents and furniture from the office were sudden, and undertaken after learning that a trustee would immediately be appointed and would take possession of the company's checkbooks and records. KCC's counsel predicted a review of the records by accountants, or possibly a reference to the Justice Department. There is significant evidence that Mr. Klein falsely represented, even to his own counsel, that no documents were being moved, and any boxes reportedly being loaded into the van contained furniture. Importantly, Mr. Klein held onto the key to storage unit 11 for at least five days after he learned that the court order required return of the documents, and may have held the key to the other unit for as much as eight days longer.

The evidence supports a conclusion that some documents removed on December 3, 1986, were not returned and that Mr. Klein had access to them at the time they disappeared. The evidence also supports a conclusion that Mr. Klein disobeyed the order by delaying turning over documents removed from the KCC premises and the keys to the storage units. We conclude that it was error to enter a judgment of acquittal, notwithstanding the jury's verdict of guilty. Accordingly, we REVERSE the judgment and REMAND for a judgment upon the verdict, and for sentencing.

---

**2.** The nineteenth box was lost track of between the trustee's warehouse and Mr. Moelmann's office; this conceivably could have been a brown Jepsen box, but Mr. Owen's testimony clearly implies that more than one box of the load moved was brown.