EL PUEBLO DE PUERTO RICO, peticionario, *v.* JOSÉ M. COLÓN BURGOS, REINALDO CASTILLO RODRÍGUEZ, acusados y recurridos.

*Número:* CE-92-531 *Resuelto:* 12 de abril de 1996

*Anabelle Rodríguez, Procuradora General*, abogada de El Pueblo; *Reinaldo Arroyo Rivera* y *Héctor Quiñones Nazario*, abogados de la parte recurrida.

El Juez Presidente Señor Andréu García emitió la opinión del Tribunal.

El Estado recurre en *certiorari* para solicitar que revoquemos la absolución perentoria de los acusados recurridos, Sres. José M. Colón Burgos y Reinaldo Castillo Rodríguez, decretada por el Tribunal Superior, Sala de San Juan (Hon. Laura Nieves de Van Rhyn, Juez) luego de que un jurado les hallase culpables de los delitos de conspiración, asesinato, encubrimiento y violaciones a la Ley de Armas de Puerto Rico.

Alega la parte recurrente que el tribunal de instancia cometió el error de adjudicar la credibilidad de la prueba al absolver perentoriamente a los acusados recurridos, invadiendo así el campo exclusivo del Jurado. Nos solicita que revoquemos la resolución del tribunal de instancia y reinstalemos el veredicto del Jurado, lo que hacemos por las razones que expondremos a continuación.

I

Los acusados recurridos fueron acusados y convictos de asesinar al joven Manuel Maldonado Irizarry y luego haber plantado un arma en la escena de los hechos para hacer parecer que los recurridos habían dado muerte a la víctima en defensa propia.

La versión de los hechos que fue presentada por el Ministerio Público y creída por el Jurado fue la siguiente. A

eso de las 3:00 de la madrugada de 15 de febrero de 1991, unos sujetos,[1] entre quienes se encontraba el señor Maldonado Irizarry, forzaron la entrada a través del techo al colmado San Miguel Cash & Carry, localizado en la calle Parque en Río Piedras. La intrusión activó una alarma que alertó a la Policía en el Cuartel de Río Piedras y al dueño, Miguel Cruz Esquilín, en su hogar, quien se dirigió rápidamente al negocio, según su testimonio en el juicio contra los acusados. Al llegar notó un carro patrulla estacionado al otro lado de la calle; no vio ocupante alguno en éste ni policías en los alrededores. Mientras abría los portones del negocio sintió a alguien que se le acercó por la espalda y le preguntó si era el dueño. Al voltearse el señor Cruz Esquilín vio que se trataba del policía Colón Burgos, quien "se veía que estaba nervioso" y le dijo "avance y abra los candados". Transcripción de Evidencia (en adelante T.E.) de 18 y 9 de agosto, pág. 103. El señor Cruz Esquilín solía dejar las luces encendidas durante la noche, por lo que al entrar se percató inmediatamente de que el techo falso estaba roto y el plástico del que estaba construido estaba regado en el piso del pasillo de la tercera góndola. Al acercarse pudo ver que bajo los escombros del techo y al lado de un carro de mover la mercancía yacía boca arriba el cuerpo del occiso Maldonado Irizarry, aún con vida, pero desangrándose por una herida en el pecho. Temiendo que pudiera haber más intrusos en el colmado, el señor Cruz Esquilín dejó al herido para examinar el resto del negocio junto con el coacusado Colón Burgos y otro policía, Erik Rivera Rivera, quien se les había unido dentro del negocio. Cuando volvían, se toparon con otro policía, el Sargento Eliseo Vázquez Díaz, quien de inmediato anunció a sus colegas que tenían que llamar al Capitán, en alusión al otro acusado, Reinaldo Castillo Rodríguez, quien entonces

---

[1] Hasta el día de hoy se desconoce cuántas personas escalaron el negocio. La Policía dijo haber visto a dos (2) personas, y hallaron un zapato que, aparentemente, se le cayó a un segundo escalador.

era Comandante del Cuartel de Río Piedras. El señor Cruz Esquilín acompañó al Sargento Vázquez Díaz a su despacho para que pudiera hacer la llamada y lo dejó allí para volver al área donde estaba el joven herido.

Al poco rato llegaron más carros patrullas y los paramédicos, pero a la llegada de éstos ya la víctima había fallecido. Debido a la confusión creada por la presencia de tantas personas entrando y saliendo del local, el señor Cruz Esquilín no se percató de la llegada del Capitán Castillo Rodríguez, quien al llegar se dirigió al pasillo donde yacía el cadáver. Se percató de su presencia cuando el Capitán salió con una pistola que el testigo no había visto antes y anunció a los presentes: "aquí está lo que éste tenía para defenderse." T.E., pág. 120. El Capitán Castillo Rodríguez, quien vestía de civil, permaneció en el lugar de los hechos pero no intervino más en la investigación del caso. Véase, *e.g.*, el testimonio de cargo de Nelson Morales Huertas, investigador forense. T.E. de 12 de agosto de 1992, págs. 82–83. El señor Cruz Esquilín lo reconoció como policía sólo porque se lo habían presentado dos (2) semanas antes en el mismo negocio.

El arma que el Capitán Castillo Rodríguez dijo haber hallado *debajo del carro de mercancía que estaba al lado del cadáver* era una pistola marca Beretta, modelo M-84, perteneciente a Francisco Cervoni Dominicis, *quien la había entregado en 1988* a la custodia de la Policía en el Cuartel del Aeropuerto Luis Muñoz Marín.[2] El señor Cervoni Dominicis testificó en el juicio que poco después de entregar la pistola volvió al Cuartel del Aeropuerto con intenciones de recobrarla y que el policía Jesús Aristud Rivera le informó que había sido enviada al depósito de armas de la Policía en el Cuartel General en Hato Rey. La prueba de cargo demostró, sin embargo, que el Cuartel Ge-

---

[2] El señor Cervoni Dominicis entregó también un revólver junto con la pistola, para las cuales tenía licencia. Las entregó temporeramente a recomendación de su abogado.

neral nunca recibió el arma. Testimonio del policía Edwin Rivera Fernández, T.E. de 21 de agosto de 1992, págs. 125–143. El señor Cervoni Dominicis testificó que no llegó a enterarse de su desaparición porque eventualmente perdió el interés y nunca fue a reclamarla al Cuartel General. El policía Aristud Rivera declaró que no tenía conocimiento personal de que la pistola hubiese sido enviada al Cuartel General, y que la información que le dio al señor Cervoni Dominicis provino de la secretaria ejecutiva, la Sra. Ana Boada, quien le había dicho que en esos días había enviado a dicho cuartel todas las armas que llevaban más de treinta (30) días en el almacén del Cuartel del Aeropuerto. En algún momento entre la entrega del arma en el Cuartel del Aeropuerto y la fecha cuando las armas que estaban depositadas allí fueron enviadas al Cuartel General, la pistola Beretta desapareció para reaparecer tres (3) años después en el San Miguel Cash & Carry en manos del Capitán Castillo Rodríguez, *quien para 1988 se desempeñaba como Comandante del Cuartel de la Policía del Aeropuerto Luis Muñoz Marín.*

Poco después del supuesto hallazgo de la pistola, como a eso de las 4:45 A.M. llegó al San Miguel Cash & Carry el agente Ramón Vélez Vélez, del Cuerpo de Investigaciones Criminales. En el juicio relató que cuando llegó al lugar de los hechos había un grupo de personas fuera del negocio, entre quienes se encontraban los investigadores forenses, varios policías y el acusado Castillo Rodríguez, a quien reconoció. Dentro del negocio se encontraban el señor Cruz Esquilín, el sargento Vázquez Díaz y los policías Rivera Rivera y el coacusado Colón Burgos.

Entrevistó primero al Sargento Vázquez Díaz, quien tenía a su cargo la custodia de la escena de los hechos. Según el testimonio del agente Vélez Vélez en el juicio, el Sargento Vázquez Díaz le contó que esa noche había llegado al colmado para responder a la alarma que se activó en el Cuartel de Río Piedras. Al llegar coincidió con los policías

Rivera Rivera y Colón Burgos, quienes también recibieron la llamada de alerta. Se dividieron en dos (2) grupos, el Sargento Vázquez Díaz se fue a la parte trasera del negocio mientras que sus compañeros se fueron al frente. Estando en la parte de atrás escuchó una detonación y corrió hacia donde estaban sus compañeros. Allí el señor Colón Burgos le informó que, a través de la reja de la entrada, le había tenido que hacer un disparo a una persona que vio dentro del negocio porque estaba apuntándole con un arma de fuego y que otro escalador había escapado. El sargento Vázquez Díaz también le dijo al mencionado agente que había sido él quien encontró el arma, al lado de la mano izquierda del sujeto abatido, y que la había removido y puesto encima de un mostrador porque aun estaba con vida y temía que la fuera a utilizar.(3)

El agente Vélez Vélez pasó entonces a entrevistar al señor Colón Burgos, quien le dijo que cuando llegó al negocio había escuchado ruidos como de martillazos provenientes del interior del colmado. Al asomarse por el portón de hierro vio a dos (2) individuos que corrían dentro del local, y que el sujeto que iba al frente, al verlo, sacó un arma y le apuntó. Al ver al intruso dijo que se identificó, que le dio el alto y que le ordenó soltar el arma, y que al no responder y continuar apuntándole le hizo un sólo disparo. Añadió que, justo previo al momento cuando le disparó, otro intruso en el negocio, que venía corriendo a espaldas del sujeto que le apuntaba, chocó con este último, haciéndole perder el balance.(4) El agente Vélez Vélez también entrevistó al policía Rivera Rivera, pero éste no le pudo dar más detalles

(3) En la declaración jurada que prestara el Sargento Vázquez Díaz durante la investigación posterior de los hechos, contradijo la razón por la que levantó el arma de la escena al expresar que cuando encontró el arma ya el joven había sido certificado muerto, e incluso él mismo dijo haberlo visto morir. "Sí sé que el individuo había muerto ya por que se quedó sin movimiento y su cabeza se viró hacia un lado. Eso yo lo pude observar." *Exhibit* Núm. 17 del Pueblo, declaración jurada de Eliseo Vázquez Díaz de 4 de abril de 1991.

(4) La importancia del choque entre los dos (2) presuntos escaladores es que de esta manera explicaría luego la defensa el hecho de que el orificio de entrada estaba en la espalda del cadáver.

porque al momento cuando oyó el disparo se hallaba en el carro patrulla pidiendo refuerzos.

A preguntas del Ministerio Público, el agente Vélez Vélez dijo que en la madrugada de los hechos no dudó la veracidad de la versión que le dieron los policías. Todo parecía concordar con lo que le habían relatado. Al examinar el torso del cadáver notó un sólo orificio de bala, cerca a la tetilla izquierda, lo que parecía confirmar que el hombre se hallaba de frente al policía Colón Burgos cuando éste le disparó. Pensó que, en efecto, el intruso estaba armado porque se había hallado una pistola que no le pertenecía a más nadie allí, la cual estaba encima del mostrador, justo donde el Sargento Vázquez Díaz dijo haberla puesto luego de encontrarla.

Aun así, el agente Vélez Vélez recordó que había varias cosas que le parecían anormales. La presencia del Capitán Castillo Rodríguez en la escena de por sí no era algo extraordinario, aun cuando estuviese vestido de civil, pero era desconcertante ante el hecho de que, siendo el policía con mayor rango allí y el comandante del cuartel de ese precinto, no parecía tener función o participación alguna en el caso. La demora de los policías en llamar al Cuerpo de Investigaciones Criminales le pareció inexplicable. También le llamó la atención la aparente inaccesibilidad para disparar desde el lugar donde el policía Colón Burgos dijo haberlo hecho.

El agente desconocía en ese momento, sin embargo, que el cadáver también tenía otro orificio de bala, lo que no hubiese levantado sospechas de no haber sido porque *era de entrada y estaba localizado en la espalda.* Éste fue descubierto por la patóloga Lyvia Álvarez, quien examinó el cadáver y analizó la trayectoria de la bala. La doctora Álvarez concluyó que el disparo que hizo el señor Colón Burgos no fue de frente, directo al pecho, como éste alegaba, sino de espalda y posiblemente mientras el joven se hallaba "eñangotado" o acostado, ya que la bala tomó una

trayectoria horizontal desde su entrada en la parte baja de la espalda, casi a la cintura, hasta su salida por el pecho. En su testimonio en el juicio, la doctora Álvarez dijo que lo más probable que hubiese pasado era que el joven "estaba doblado en el pasillo [entre las góndolas] ..., doblado hacia la izquierda, recibe el disparo [en la parte trasera de la cintura] y por eso sigue caminando y luego se da vuelta y cae boca arriba". T.E. de 31 de agosto y 1ro, 2, y 3 de septiembre de 1992, pág. 12.

El descubrimiento del segundo orificio que hace la doctora Álvarez y el rastreo de la pistola ocupada hasta el Cuartel del Aeropuerto convencieron a las autoridades de que los policías involucrados habían mentido para encubrir lo que parecía evidente: *que el joven Manuel Maldonado Irizarry estaba desarmado y de espalda cuando el policía Colón Burgos le hizo el disparo*. El encubrimiento, según los hechos probados ante el Jurado por el Ministerio Público, comenzó esa misma madrugada, con la llamada del Sargento Vázquez Díaz al Capitán Castillo Rodríguez, quien tenía un arma "realenga" desde sus días en la comandancia del Aeropuerto, la cual plantó en la escena para encubrir el asesinato que había cometido el policía Colón Burgos.

A base de esas conclusiones, el Ministerio Público acusó al Agente Colón Burgos de conspiración para encubrir, encubrimiento y asesinato en segundo grado;[5] al Agente Rivera Rivera de conspiración; al Sargento Vázquez Díaz de conspiración, encubrimiento y perjurio;[6] al Capitán Castillo Rodríguez de conspiración, encubrimiento, apropiación ilegal[7] y posesión y portación ilegal[8] de una pistola que estaba bajo custodia de la Policía. Los cargos contra el

---

[5] Respectivamente a los Arts. 262, 236, 82 y 83 del Código Penal, 33 L.P.R.A. secs. 4523, 4432, 4001 y 4002.

[6] Art. 225 del Código Penal, 33 L.P.R.A. sec. 4421.

[7] Art. 165 del Código Penal, 33 L.P.R.A. sec. 4271.

[8] Respectivamente, Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418.

Agente Rivera Rivera fueron desestimados, al igual que los cargos por apropiación ilegal contra el Capitán Castillo Rodríguez y por perjurio contra el Sargento Vázquez Díaz.

El juicio contra los tres (3) restantes acusados comenzó el 3 de agosto de 1992. El juicio contra el Sargento Vázquez Díaz fue por Tribunal de Derecho, habiendo sido por jurado el de los otros dos (2). Luego de concluir el desfile de la prueba de cargo, los abogados de los acusados solicitaron la absolución perentoria de los tres (3), en la cual alegaron que la prueba era insuficiente; el tribunal rechazó dicha solicitud.[9] A la conclusión del juicio, el Sargento Vázquez Díaz fue absuelto en todos los cargos por tribunal de derecho. El Jurado que juzgó al Agente Colón Burgos le halló culpable del asesinato y lo absolvió del encubrimiento y la conspiración, mientras que al Capitán Castillo Rodríguez le hallaron culpable en todos los cargos. Dichos acusados reprodujeron la solicitud de absolución perentoria y el 8 de septiembre de 1992 el Tribunal Superior dictó una resolución que acogió los planteamientos de éstos. En ésta tildó de "sorprendente" el veredicto emitido por el Jurado y concluyó que la prueba fue insuficiente para sostener una convicción.

---

[9] Uno de los efectos que tiene la absolución perentoria es que al acortar el proceso criminal, economiza y agiliza la función de impartir justicia. El hecho de que tenga este efecto no significa que sea el único de los efectos y, más importante aun, que sea la motivación de la Regla 135 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. La facultad de absolver perentoriamente a un acusado persigue un sólo fin: liberar a un ciudadano del proceso criminal en su contra cuando resulta obvio que no es imputable. Los efectos que tenga son colaterales a este principio rector e irremediablemente han de ceder cuando entran en conflicto. Véase, *e.g.*, A. Cintrón García, *Manual de Derecho Procesal Penal*, San Juan, Oficina de Administración de los Tribunales, 1987, págs. 217–218. La reserva del fallo atiende mayormente casos en los que el tribunal pretende absolver en sólo ciertos de los cargos imputados y no desea influenciar al Jurado en cuanto a los cargos restantes. Íd., págs. 222–223. Fuera de esos casos es difícil justificar que un tribunal que tenga ante sí todos los elementos necesarios de juicio para decretar que una absolución perentoria continúe exponiendo a un acusado, no sólo al trauma del proceso criminal, sino a un veredicto condenatorio del Jurado. E. Ruiz Laabes, E.E. Crespo y D. López Pritchard, "Seminario sobre las Propuestas Reglas de Procedimiento Criminal", Div. de Investigaciones y Asuntos Criminales, Depto. de Justicia, 1960, págs. 195–196; Cintrón García, *op. cit.*, pág. 220. Salvo en excepciones, el tribunal no deberá reservarse el fallo absolutorio cuando ha llegado a la conclusión de que un jurado razonable no podría hallar culpable legalmente al acusado a base de la prueba de cargo presentada.

Habiendo recurrido ante nos el Ministerio Público, plantea que el tribunal de instancia confundió el criterio de suficiencia con el de credibilidad, a la vez que permitió erróneamente a los acusados recurridos reproducir la moción de absolución perentoria luego de haber expirado el término que para ello concede la Regla 135 de Procedimiento Criminal vigente, 34 L.P.R.A. Ap. II.

## II

La absolución perentoria es la facultad que tiene un tribunal para examinar la suficiencia de la prueba de cargo y decretar, a base de dicho examen, la no culpabilidad de un acusado. La Regla 135 de Procedimiento Criminal, *supra*, que codifica dicha potestad, dispone:

> Queda abolida la moción para que se ordene un veredicto absolutorio. El tribunal a instancia propia o a instancia de un acusado decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos.
>
> De presentarse una moción de absolución perentoria luego de practicada toda la prueba, el tribunal podrá reservarse su resolución, someter el caso al jurado y resolver la moción bien antes del veredicto o después del veredicto o de disolverse el jurado sin rendir veredicto. Si el tribunal declarare sin lugar la moción antes de rendirse un veredicto de culpabilidad o de disolverse el jurado sin veredicto, la moción podrá reproducirse dentro de los tres (3) días de rendido el veredicto o disuelto el jurado siempre que no se hubiere dictado sentencia. 34 L.P.R.A. Ap. II.

Aunque la citada Regla 135 aplica por igual a juicios por tribunal de derecho, la misión fundamental de la absolución perentoria va dirigida a eliminar la posibilidad de que *un jurado* condene a un acusado cuando la prueba es insuficiente. Este imperativo es evidente de la primera oración de la Regla 135, *supra*, que abolió la antigua orden de veredicto absolutorio. Ésta antecedía a la absolución pe-

rentoria como figura procesal mediante la cual un acusado podía ser absuelto, previo al comienzo de la etapa de dirimir la credibilidad de la prueba. Cuando dichos casos se veían por tribunal de derecho, naturalmente el tribunal no podía ordenar un veredicto absolutorio, sino que sencillamente absolvía al acusado. A. Cintrón García, *Manual de Derecho Procesal Penal*, San Juan, Oficina de Administración de los Tribunales, 1987, pág. 216. Véanse, también: 2 *Wright, Federal Practice and Procedure: Criminal 2d* 636–638 (1982); 4 *Orfield's Criminal Procedure Under the Federal Rules* 676–678 (1967). La citada Regla 135 combinó ambas posibilidades.

Respecto a los juicios por jurado, nuestro sistema procesal penal adopta el esquema del derecho común anglosajón en que el tribunal y el Jurado son llamados a desempeñar funciones distintas e independientes con un fin común. O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Orford, Ed. Equity, 1990, Vol. I, págs. 67–68. Véase, también, R.H. Winningham, *The Dilemma of the Directed Acquittal*, 15 Vand. L. Rev. 699, 700 (1962). Si tanto el Jurado como el tribunal tienen injerencia en la evaluación de la prueba, la función de cada uno está circunscrita a encomiendas distintas: el primero a la apreciación de los hechos y el segundo a la conformidad de éstos al derecho. La responsabilidad del Jurado estriba en evaluar la prueba y determinar si ésta le merece credibilidad, decisiones que le permiten llegar a un veredicto sobre la culpabilidad del acusado. A menudo, sin embargo, antes de que la prueba llegue al Jurado se requiere la intervención del tribunal para asegurar que ésta se conforme al Derecho. Por esta razón, aunque en un juicio por jurado el tribunal no dirime la credibilidad de la prueba, nuestro sistema procesal y evidenciario le obliga a decidir cuestiones de admisibilidad de evidencia, competencia de testigos, capacidad pericial y existencia de privilegios. E.L. Chiesa Aponte, *Derecho penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Fo-

rum, 1993, Vol. III, págs. 396–397. Dichas intervenciones depuran la prueba para evitar que factores prejuiciables minen el proceso deliberativo del Jurado. La Regla 135 de Procedimiento Criminal, *supra*, establece una de estas actuaciones preliminares al permitir que, *motu proprio* o a solicitud de parte, el tribunal impida la continuación del caso o, incluso, revoque el veredicto del Jurado cuando la prueba es insuficiente para sostener una convicción. Aunque a primera vista esto podría parecer una usurpación de la responsabilidad del Jurado de evaluar la credibilidad de la prueba, en realidad no existe tal fusión de funciones bajo la absolución perentoria. Véase sobre la Regla 29 de Procedimiento Criminal federal, base de nuestra Regla 135, *supra*, el caso *United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977).

La *suficiencia* que compete al tribunal evaluar cuando pasa juicio sobre una moción de absolución perentoria es un concepto distinto al de *credibilidad* que compete al Jurado evaluar en un juicio por jurado. La credibilidad consiste en una asignación valorativa de certeza o probabilidad sobre una versión de los hechos o acontecimientos incidentales al caso. El Jurado está llamado a hacer este ejercicio valorativo sobre la totalidad de la prueba y para éste sólo se requiere valerse del sentido común, la lógica y la experiencia para deducir cuál de las versiones, si alguna, prevalece sobre las otras. Los criterios que guían la evaluación de la prueba en un juicio son idénticos a aquellos que utilizamos en la vida cotidiana, tales como el comportamiento y el carácter de quienes dan su versión de los hechos, la parcialidad que pueda afectarles, la naturaleza de la declaración y otros. Véase Regla 44(B) de Evidencia, 32 L.P.R.A. Ap. IV. Por lo tanto, el juicio sobre la credibilidad de la prueba prescinde de conocimientos previos o especializados en derecho.

La *suficiencia*, por otro lado, no dispone sobre el valor probatorio o la veracidad de la evidencia. El análisis

de suficiencia examina el contenido y la existencia de la evidencia, no su valor o peso, y en el proceso penal asegura que la prueba de cargo contenga al menos un mínimo de los requisitos imprescindibles para permitir que el caso pase a manos del Jurado. Estos requisitos son aquellos que establece el derecho para configurar el delito, aquellos sin los cuales no podría hallarse culpable a un acusado *irrespectivamente de los méritos valorativos de la prueba presentada*. El análisis de la suficiencia de la prueba, al contrario de la evaluación de la credibilidad, *requiere poder identificar en la prueba aquellos elementos necesarios en derecho para poder concluir cuándo una persona es culpable de cometer un delito*. Debido a que obliga al juez que preside el proceso a interpretar el derecho penal, desde el punto de vista procesal y evidenciario, quien desempeña esta función debe dominar, o al menos estar instruido detalladamente, sobre los requisitos que el derecho exige para concluir que se ha violado la ley. El examen de la suficiencia de la prueba hace imprescindible la intervención preliminar del tribunal para determinar si el Jurado tendrá ante sí los elementos necesarios en derecho para poder llegar a un veredicto condenatorio, y en aquellos casos en que ya se ha rendido un veredicto con prueba insuficiente, su revocación.

Los acusados recurridos alegan que la Regla 135 de Procedimiento Criminal, *supra*, permite al tribunal de instancia a penetrar "no sólo una cuestión de puro derecho, sino también en la apreciación de la prueba, factor que le estaba vedado bajo el anterior Código de Enjuiciamiento Criminal". Oposición a petición de *certiorari*, pág. 8.[10] Llegan a dicha conclusión al confundir la función de un tribu-

---

[10] El lenguaje utilizado por el Art. 257 del Código de Enjuiciamiento Criminal de 1902, Estatutos y Códigos Revisados de Puerto Rico de 1902, pág. 734, y el Art. 240 de la versión de 1935, era el mismo, y ambos disponían:

"Si en cualquier momento después de terminada para ambas partes la presentación de pruebas, el tribunal considera éstas insuficientes para justificar la declaración de culpabilidad, ordenará perentoriamente al jurado que absuelva al acusado."

nal de instancia en un juicio por jurado con aquella que responde a un tribunal apelativo. En el esquema de división de funciones a nivel de instancia entre el tribunal y el Jurado, al tribunal le quedan vedadas las determinaciones sobre la credibilidad y el peso de la prueba, el campo que ocupa el Jurado en este arreglo del derecho común anglosajón.[11] Aunque a nivel apelativo el tribunal tiene plena facultad para examinar la evidencia presentada en el juicio a los fines de determinar si el veredicto del Jurado estuvo sostenido por prueba suficiente, por claras razones de política pública existe la norma que promulga la abstención de atender cuestiones de credibilidad que han sido previamente adjudicadas por el juzgador de los hechos en primera instancia.

Al considerar una moción de absolución perentoria, el tribunal de instancia ha de limitarse a adjudicar si la prueba es suficiente en derecho para proceder a someterla al Jurado, para que sea éste quien decida sobre el peso que deba dársele. Orfield, *supra,* pág. 699; 3 *Wharton's Criminal Procedure* 969–971 (1991); J.C. Cissell, *Federal Criminal Trials*, 4ta ed., Virginia, Ed. Michie Co., 1992, pág. 306. Precisamente por tratarse de un examen sobre los requisitos con los que *en derecho* ha de cumplir la prueba, el análisis de la suficiencia de la prueba prescinde de evaluar la credibilidad o el peso de ésta. Chiesa Aponte, *op. cit.,* págs. 415–417.

---

El criterio de suficiencia utilizado en ambos es el mismo que el que emplea la Regla 135 actual, *supra,* por lo que no vemos cómo este último pudiera permitir facultades antes vedadas.

[11] La división de tareas entre el tribunal y el Jurado llegó a Puerto Rico con el cambio de soberanía, que reemplazó el sistema procesal español con el del derecho común. La ley procesal penal en 1898 era la Ley de Enjuiciamiento Criminal para las islas de Cuba y Puerto Rico, que mediante el Real Decreto Número 254 de 19 de octubre de 1888 hizo extensivo a ambas islas el Código de Enjuiciamiento Criminal entonces vigente en la Península con las modificaciones propuestas por la Comisión de Códigos de Ultramar. Colección Legislativa de España, Tomo 141, Segundo Semestre de 1888, Madrid, 1890. Dicho código no disponía juicios por jurado, y el tribunal sentenciador hacía de juez de hechos y de derecho. No fue hasta 1901 que quedó establecido el juicio por jurado en Puerto Rico, mediante la Ley de 12 de enero de 1901, efectiva el 1ro de abril del mismo año, 34 L.P.R.A. sec. 462n.

La suficiencia de la prueba es, pues, un análisis estrictamente en derecho que, aunque recae sobre la evidencia, sólo busca asegurar que *de cualquier manera en que se interprete la veracidad,* los requisitos legales estarán presentes para poder permitir cualquiera de los veredictos posibles. Ante prueba insuficiente, un jurado no podría hallar culpable al acusado, irrespectivamente de si la prueba amerita o no su credibilidad. En dichos casos, los imperativos constitucionales obligan a absolver al acusado. *In re Winship,* 397 U.S. 358, 363 (1970); *Pueblo v. Ramos y Álvarez,* 122 D.P.R. 287, 315–316 (1988). Véase Chiesa Aponte, *op. cit.,* Vol. II, págs. 91–111.

La prueba suficiente, esto es, aquella que permite en derecho hallar a un ciudadano culpable más allá de duda razonable, requiere que el Estado establezca todos los elementos del delito y la conexión del acusado con éstos. *Pueblo v. Ramos y Álvarez,* supra, pág. 316; *Pueblo v. Bigio Pastrana,* 116 D.P.R. 748, 760–761 (1985). Véase Chiesa, *op. cit.,* pág. 95. Como primer paso a una determinación de suficiencia, el tribunal ha de cerciorarse que el Ministerio Público haya aducido prueba, directa o circunstancial, de todos los elementos del delito imputado. *Pueblo v. Castañón Pérez,* 114 D.P.R. 532, 538–540 (1983); *Pueblo v. Negrón Vélez,* 96 D.P.R. 419, 430 (1968); *El Pueblo v. Delgado,* 18 D.P.R. 951, 953–955 (1912). En *El Pueblo v. Delgado,* supra, este tribunal ofreció dos (2) ejemplos de insuficiencia de prueba por ausencia de los elementos del delito: un caso de asesinato en el cual no se presente prueba de la muerte de la víctima y uno de seducción en el que no se haga alusión a la promesa de matrimonio. En ambos casos, la omisión de elementos necesarios impide que se configure el delito, por lo que el caso no puede resultar en una convicción no importa la forma como el Jurado adjudique la credibilidad de los hechos.

Desfilar cualquier prueba sobre los elementos del delito, sin embargo, no basta para alcanzar el grado de

suficiencia. Winnigham, *supra,* pág. 705. También se exige que la evidencia conecte al acusado con los delitos imputados, una función eminentemente propia del juzgador de la credibilidad. Dentro de la responsabilidad del tribunal de examinar la suficiencia, éste ha de asegurarse de que la prueba de cargo sea una que, *de ser creída,* pueda conectar al acusado con el delito imputado. Nuevamente, este es un ejercicio que prescinde de evaluar la credibilidad de la prueba, pues no se intenta pasar juicio sobre su veracidad, sino de cerciorarse de que contenga lo necesario en derecho para permitir una convicción válida.

## III

Hemos expresado antes que la prueba sobre los elementos del delito y la conexión del acusado "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza y convicción moral en una conciencia exenta de preocupación". *Pueblo v. Carrasquillo Carrasquillo,* 102 D.P.R. 545, 552 (1974). Véanse: *Pueblo v. Sánchez Molina,* 134 D.P.R. 577, 586 (1993); *Pueblo v. Rodríguez Román,* 128 D.P.R. 121, 131 (1991); *Pueblo v. Bigio Pastrana,* supra, pág. 760. Por ello, la determinación sobre la suficiencia de la prueba requiere en ocasiones que el tribunal se cerciore de que no sólo los elementos del delito imputado han quedado expuestos, sino de que la prueba de cargo es susceptible de ser creída. Esto es, que como cuestión de derecho, ésta intrínsecamente permite que sea sometida a un análisis de credibilidad. *Wharton's,* supra, pág. 971. La función del tribunal al analizar si la evidencia es susceptible de ser creída sólo requiere determinar si la evidencia *puede ser creída por una persona razonable y de conciencia no prevenida,* sin entrar a dirimir la credibilidad que amerita la prueba presentada. En estos casos, al igual que en los demás, la solicitud de absolución perentoria busca evitar que un ciudadano sea convicto sin el rigor que nuestro

ordenamiento exige, una vez el tribunal llegue al convencimiento de que la evidencia presentada *no puede rebasar la duda que necesariamente habría de tener una persona razonable, de ánimo no prevenido, sobre la culpabilidad del acusado*, como sucede cuando la evidencia es inherentemente irreal o improbable. Veáse *Pueblo en interés menores A.L.R.G. y F.R.G.*, 132 D.P.R. 990 (1993), y casos allí citados.

 En ocasiones anteriores, este Tribunal ha definido la *suficiencia evidenciaria* como la presencia del mínimo indicio de prueba de cargo. Véanse, *e.g.*: *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454, 475 (1988); *Pueblo v. Portalatín*, 73 D.P.R. 334 (1952); *Pueblo v. Rosado*, 72 D.P.R. 827 (1951). El mínimo constitucional para permitir una convicción exige, como ya hemos expresado, alguna prueba de todos los elementos del delito y que la evidencia sea satisfactoria. El estándar de la *scintilla* no necesariamente está reñido con el mínimo constitucional, en la medida en que ambos fijan un mínimo de prueba que el Estado ha de presentar para poder lograr una convicción. La *scintilla* o mínimo indicio de prueba sencillamente expresa que el debido proceso de ley exige un mínimo de prueba de cargo sin establecer el alcance de ese mínimo. El nombre que quiera dársele a este mínimo, sea una *scintilla* o una presentación prima facie, no alterará el alcance del concepto de suficiencia, pues no es el mínimo indicio de cualquier prueba, *sino prueba que, como mínimo, exponga todos los elementos del delito y sea susceptible de ser creída por una persona razonable.*

 Hay que notar que el estándar de la *scintilla* fue aplicado a la regla de absolución perentoria tomado directamente de otras figuras del derecho civil, y luego del derecho penal, sin tomar en consideración los propósitos particulares y las necesidades que atiende dicha regla. En ocasiones se utilizó de manera indistinta el *nonsuit*, el sobreseimiento y la excepción perentoria como si se trataran

de la *absolución perentoria* (o la orden de veredicto absolutorio), cuando eran figuras distintas. Véanse, por ejemplo: *Castro v. Payco, Inc.*, 75 D.P.R. 63, 67 (1953); *Mariani v. Christy*, 73 D.P.R. 782, 795 (1952); *Pueblo v. Rosado*, supra; *José Malgor & Cía. v. B. Silva Sucrs.*, 70 D.P.R. 803, 807 (1950); *Rubio et al. v. Garage Martínez, Inc.*, 23 D.P.R. 609 (1916); *Rosado v. Ponce Railway & Light Co.*, 18 D.P.R. 609 (1912); *Viso v. Puerto Rico Sugar Co.*, 17 D.P.R. 438 (1911). Trazando la historia de la absolución perentoria a la desestimación involuntaria (*nonsuit*) en el campo civil, algunos autores expresan que el estándar de la *scintilla* es totalmente equivocado y reñido con el criterio de suficiencia exigido para derrotar un planteamiento de absolución perentoria. Orfield, *op. cit.*, pág. 697 ("A *mere scintilla is not enough ... to justify the submission of a case to the jury.*"); Winnigham, *op. cit.*, pág. 705 ("*It is generally agreed that the scintilla rule has no application in a criminal case.*"); W. Wirt Blume, *Origin and Development of the Directed Verdict*, 48 Mich. L. Rev. 555, 564–565 (1950) ("... *a mere 'scintilla' of evidence or a mere 'surmise' is not enough to take the case to the jury.*"). Dado el uso genérico y ambiguo del término *scintilla*, creemos que el estándar del mínimo indicio o *scintilla* se presta a confusión y debe ser descartado cuando se habla de la absolución perentoria.

En resumen, pues, la evidencia es suficiente, a los fines de derrotar una solicitud de absolución perentoria cuando se haya presentado evidencia de todos los elementos del delito y la prueba de cargo sea susceptible de ser creída. El mismo estándar ha sido adoptado con unanimidad en el derecho común anglosajón. Véanse: Orfield, *op. cit.*, págs. 698–699; *Wharton's*, supra, págs. 967–969; 3 *LaFave and Israel, Criminal Procedure* 38 (1984); Wright, *op. cit.*, págs. 658–60; W. A. Beltz (ed.), *BNA Criminal Practice Manual* Sec. 121: 601–2 (1993); Cissell, *op. cit.*, pág. 306. Véanse, también: *Wright v. West*, 505 U.S. 277 (1992); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *In re Winship*,

supra, págs. 361–364; *Glasser v. United States*, 315 U.S. 60 (1942); *U.S. v. Robbins*, 21 F.3d 297, 298–299 *reh.* denegado (8vo Cir. 1994); *U.S. v. Fleming*, 19 F.3d 1325, 1328 (10mo Cir. 1994); *U.S. v. Barfield*, 999 F.2d 1520, 1522 (11mo Cir. 1993); *U.S. v. Lake*, 985 F.2d 265, 267 (6to Cir. 1993); *U.S. v. Gomes*, 969 F.2d 1290, 1292 (1er Cir. 1992); *U.S. v. Barfield*, 969 F.2d 1554, 1558 (4to Cir. 1992); *U.S. v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1210 (9no Cir. 1992); *U.S. v. Williams*, 923 F.2d 1397, 1402 (10mo Cir. 1990), *cert.* denegado, 500 U.S. 925, 114 (1990); *U.S. v. Klein*, 910 F.2d 1533, 1538 (7mo Cir. 1990); *U.S. v. Heuer*, 916 F.2d 1457, 1461 (9mo Cir. 1990); *U.S. v. Lane*, 883 F.2d 1484, 1495 (10mo Cir. 1989), *cert.* denegado, 493 U.S. 1059; *U.S. v. Taylor*, 972 F.2d 1247, 1250 (11mo Cir. 1981); *United States v. Zicree*, 605 F.2d 1381, 1384–1385 (5to Cir. 1979), *reh.* denegado 609 F.2d 826, *cert.* denegado, 445 U.S. 966, 964 (1979); *United States v. Fredericks*, 586 F.2d 470, 474 (5to Cir. 1978), *cert.* denegado, 440 U.S. 962, 959 (1978); *United States v. Reese*, 561 F.2d 894, 898 (Cir. D.C. 1977); *United States v. Carter*, 311 F.2d 934, 940 (6to Cir. 1963), *cert.* denegado, 373 U.S. 915, 1301, *reh.* denegado 373 U.S. 954; *Borum v. United States*, 380 F.2d 595, 597 (D.C. App. 1967); *Randolph v. State*, 401 S.E.2d 310 (1991); *State v. Belyeu*, 795 P.2d 229 (Arizona App. 1990); *Perez v. State*, 565 So.2d 743 (1990), *rev.* denegada, 576 So.2d 290 (1991); *Curry v. U.S.*, 529 A.2d 255 (1987); *State v. Law*, supra; *Curley v. United States*, 160 F.2d 229, 232–233 (2do Cir. 1947), *cert.* denegado, 331 U.S. 837.

## IV

Un examen de la resolución mediante la cual se absolvió de forma perentoria a los acusados en este caso no deja dudas de que el tribunal de instancia rebasó los límites de su función y usurpó la del Jurado. De partida, el tribunal hizo claro que su decisión se fundamentaba en su apreciación y valorización de la prueba cuando, al comenzar su

resolución, expresó que "es necesario consignar que el testimonio que prestara Cruz Esquilín en el juicio, no nos merece crédito alguno". Resolución de 8 de septiembre de 1992, pág. 6.(12) Prosiguió a restarle crédito al testimonio de dicha persona por "sus respuestas evasivas, sus omisiones, y su grado de alteración emocional ante el examen de los abogados de defensa". Íd. Descartó, también, la prueba por ser circunstancial, como lo hizo con aquella que tendía a demostrar que el Capitán Castillo Rodríguez se apropió ilegalmente del arma y la colocó en el lugar de los hechos. Luego de examinar la prueba concluyó que "la prueba desfilada s[ó]lo da base para concluir que fue un accidente desgraciado". Íd., pág. 9.

El tribunal de instancia erró al absolver de forma perentoria a los acusados porque no era a éste a quien correspondía dirimir la credibilidad de la prueba. Emana claro de su resolución que el tribunal utilizó un examen de suficiencia erróneo e impropio a sus funciones exclusivas de dirigir el juicio y aplicar el derecho. Su decisión se fundamentó en su propia y particular apreciación de los hechos, criterios que no tienen cabida en el examen de suficiencia que requiere la absolución perentoria. El examen que a esos fines hemos hecho nos demuestra, como hemos visto, que la evidencia probó todos los elementos de los delitos imputados. Nada se desprende de dicho examen que nos mueva a descartar dicha evidencia; ella es susceptible de ser creída por cualquier persona razonable y goza de suficientes garantías de veracidad. Dirimidos por el Jurado los conflictos que presentó la evidencia referida, no existe fundamento alguno en este caso para dejar sin efecto los fallos

---

(12) El tribunal alega que la prueba demostró que el señor Cruz Esquilín estaba de espalda cuando el señor Castillo Rodríguez salió del pasillo donde yacía el cadáver del joven Maldonado Irizarry. Esta prueba, de ser cierta, es meramente conflictiva, materia para el Jurado decidir. No se trata de prueba que no es susceptible de ser creída, que sería, por ejemplo, si el testigo hubiese dicho que vio al acusado recurrido con los ojos que tenía en la espalda.

condenatorios emitidos por dicho cuerpo. El Estado tiene razón en que la comisión de este error amerita revocar dicha resolución.

Consideramos que no es necesario pronunciarnos sobre la segunda parte del único señalamiento de error del Ministerio Público en torno a la facultad de reproducir la moción de absolución perentoria después de haber transcurrido el término de tres (3) días contados a partir de la fecha del veredicto dispuesto por la Regla 135 de Procedimiento Criminal, *supra*.

Por los fundamentos antes expuestos, *procede la revocación de la resolución del Tribunal Superior que decretó la absolución de los acusados recurridos, señores Colón Burgos y Castillo Rodríguez. Se dictará sentencia para reinstalar los veredictos de culpabilidad emitidos por el Jurado en contra de los acusados y se ordenará al tribunal de instancia a pronunciar la pena que corresponda a cada uno de dichos acusados.*

