TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el Sr. Javier Pagán Cruz y nos solicita que revoquemos un dictamen emitido el 15 de abril de 2008 por el Tribunal de Primera Instancia, Sala Superior de Humacao, mediante el cual se le condenó a 109 años de reclusión por *636 infracción a los Artículos 106 del Código Penal, 33 L.P.R.A. see. 4734 y 5.15 de la Ley de Armas de Puerto Rico, Ley Núm. 404 de 11 de septiembre de 2000, 25 L.P.R.A. sec. 458n.
Inconforme, el apelante aduce que el tribunal a quo erró al apreciar la prueba que tuvo ante sí. Señala que el referido foro se equivocó al concluir que el Ministerio Público probó más allá de duda razonable su culpabilidad por los mencionados delitos.
Por los fundamentos que expondremos a continuación, se confirma la sentencia apelada.
I
Los hechos que motivaron las acusaciones de asesinato en primer grado e infracción al Artículo 5.15 de la Ley de Armas, supra, contra el apelante y por las cuales resultó convicto, son los mismos que originaron el caso Pueblo v. Sustache Sustache, res. el 9 de julio de 2009, 176 D.P.R._(2009), 2009 J.T.S. 122, resuelto recientemente por el Tribunal Supremo de Puerto Rico. A continuación, expondremos un resumen de los mismos según éstos fueron expuestos por el referido foro en la citada opinión.
El “Club de Motoras Scooters de Punta Santiago” es un grupo de motociclistas compuesto por 11 personas, entre ellos, el señor Miguel Cáceres Cruz. El 11 de agosto del 2007, el aludido club acudió al sector Punta Santiago del pueblo de Humacao para formar parte de la escolta de una quinceañera. Al llegar al lugar, colocaron sus motoras de forma que éstas obstruyeron el carril derecho de la carretera. El señor Cáceres Cruz y otro miembro del club se ubicaron en lados opuestos del carril izquierdo para dirigir el tránsito y evitar que se creara una congestión vehicular.
Mientras el señor Cáceres Cruz dirigía el tránsito, pasó por el lugar una patrulla de la policía con los agentes Zulma Díaz de León, Carlos Sustache Sustache y Javier Pagán Cruz en su interior. El señor Cáceres Cruz le hizo señales a los agentes del orden público para que continuaran su marcha, lo cual provocó que éstos detuvieran el vehículo, se bajaran de la patrulla y le cuestionaran al señor Cáceres Cruz su autoridad para dirigir el tránsito. Además, ordenaron que se sacaran las motoras de la vía pública debido a que estaban obstruyendo el tránsito.
El club de motociclistas procedió a mover las motoras a la acera y los policías se montaron en la patrulla, iniciando nuevamente su marcha. No obstante, alegadamente se desarrolló un intercambio de palabras entre el agente Pagán Cruz y el señor Cáceres Cruz que provocó que los tres policías se bajaran nuevamente del vehículo oficial. La agente Díaz de León intentó arrestar al señor Cáceres Cruz, pero éste caminó hacia atrás y le solicitó a los agentes que no lo tocaran.
El oficial Pagán Cruz también intentó poner bajo custodia al señor Cáceres Cruz, quien continuó caminando en retroceso para evitar el arresto. En ese momento, el mencionado agente golpeó en la cabeza al señor Cáceres Cruz, tumbándolo al suelo. Acto seguido, se ubicó encima de éste y lo continuó golpeando con sus puños. El cuerpo del señor Cáceres Cruz quedó entre las piernas del oficial. Ni la agente Díaz de León, ni el agente Sustache Sustache, evitaron que el policía Pagán Cruz siguiera golpeándolo.
El señor Cáceres Cruz trató de levantarse del piso agarrándose de la correa de la baqueta que el agente Pagán Cruz tenía en el muslo de su pierna derecha y en la cual portaba su arma de reglamento. El policía Pagán Cruz sujetó la baqueta y, en el forcejeo para evitar que el señor Cáceres Cruz se levantara, el revólver se disparó, hiriendo de bala al referido agente en el muslo izquierdo. Al sentir que su pierna izquierda flaqueaba, el oficial Pagán Cruz se recostó de un zafacón y de un poste del tendido eléctrico. El señor Cáceres Cruz, por su parte, quedó boca arriba acostado en el piso luego de la detonación.
Al verse herido, el policía Pagán Cruz sacó su pistola de la baqueta, la cargó y le disparó varias veces al señor Cáceres Cruz. Al recibir los impactos de bala, el cuerpo del señor Cáceres Cruz cayó hacia el lado derecho. El agente Pagán Cruz se bajó hacia el cuerpo del señor Cáceres Cruz, buscó su cabeza y le disparó. Finalmente, metió el revólver en la baqueta y se recostó de un vehículo. Durante el incidente, ni la agente Díaz de León, ni el agente Sustache Sustache intervinieron.
Por estos hechos, se acusó al agente Pagán Cruz de asesinato en primer grado y violación al Artículo 5.15 de la Ley de Armas, supra. Además, se acusó a los agentes Díaz de León y Sustache Sustache de asesinato en primer grado en la modalidad de cooperador. El juicio en su fondo culminó el 11 de abril de 2008, luego del cual el TPI halló culpable al apelante de los dos delitos imputados.
*637 El 15 de abril de ese mismo año, el foro a quo lo sentenció a una pena de 109 años de reclusión, 99 por el asesinato y 10 por la infracción a la Ley de Armas.
Inconforme con la sentencia, el peticionario plantea e imputa al TPI incidir de la siguiente manera:
“Erró el Tribunal de Primera Instancia como cuestión de derecho al determinar que la prueba de cargo tipificó mas allá de duda razonable el elemento subjetivo del tipo de premeditación, necesario para un fallo de culpabilidad por asesinato en primer grado.
Erró el Tribunal de Primera Instancia como cuestión de derecho al no determinar que la prueba de cargo probó los elementos que tipifican el asesinato en segundo grado.
Erró el Tribunal de Primera Instancia como cuestión de derecho al determinar que la prueba de cargo no tipificó los elementos de asesinato atenuado.
Erró el Tribunal de Primera Instancia como cuestión de derecho al determinar que la prueba de cargo no probó los elementos de asesinato atenuado.
Erró el Tribunal de Primera Instancia al otorgar credibilidad a la prueba testifical de cargo incongruente y mutuamente excluyente.
Erró el Tribunal de Primera Instancia al no decretar un nuevo juicio por el incumplimiento del Ministerio Público con sus obligaciones de descubrir prueba impugnatoria, violentando el derecho constitucional del peticionario a preparar adecuadamente su defensa.”
Con el beneficio de la transcripción de la prueba oral y la comparecencia del Pueblo de Puerto Rico, a través del Procurador General, procedemos a resolver la controversia en sus méritos.
n
Por estar estrechamente relacionados, discutiremos en conjunto los seis errores planteados por el apelante. Los errores imputados por el señor Pagán Cruz en su recurso versan sobre la apreciación que el TPI hizo de la prueba que se le presentó. Alega que la evidencia presentada por el Ministerio Fiscal no probó más allá de duda razonable la existencia del elemento de premeditación, indispensable para que se configure el delito de asesinato en primer grado por el que resultó convicto. Argumenta que, en todo caso, sólo procedía condenarlo por los delitos de asesinato en segundo grado o asesinato atenuado. Finalmente, señala que no se probó más allá de duda razonable su culpabilidad por la infracción al Artículo 5.15 de la Ley de Armas, supra.
La Constitución de Puerto Rico garantiza a todos los ciudadanos el derecho fundamental a la presunción de inocencia en todo proceso criminal hasta que se pruebe lo contrario. Para controvertir esta presunción, se le exige al Ministerio Público un quántum de prueba más allá de duda razonable. Ello requiere que el Estado presente prueba suficiente respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de éste. Ello es consustancial con la presunción de inocencia y constituye uno de los imperativos del debido proceso de ley. Pueblo v. Santiago, González, res. el 11 de junio de 2009, 176 D.P.R._(2009), 2009 J.T.S. 104; Pueblo v. Irizarry, 156 D.P.R. 780 (2002);.
La “duda razonable” no es una duda especulativa ni imaginable, ni cualquier duda posible. El aludido concepto ha sido definido por la jurisprudencia como “aquella duda fundada que surge como producto del raciocinio de todos los elementos del juicio envueltos en el caso.” Pueblo v. Irizarry, supra, a la pág. 788, citando a Pueblo v. Cruz Granados, 116 D.P.R. 3 (1984). Es decir, duda razonable no es otra cosa que la insatisfacción de la conciencia del juzgador con la prueba presentada. De este modo, para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación. Pueblo v. Santiago, González, supra.
Como cuestión de derecho, la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación. Sin embargo, sólo ante la presencia de los elementos de pasión, prejuicio, parcialidad o error manifiesto, o cuando la prueba no concuerde con la realidad fáctica y sea inherentemente imposible o increíble, es que *638 intervendremos con la apreciación que, de ésta, haga el Tribunal de Primera Instancia. Pueblo v. Irizarry, supra.
Debe quedar claro que la responsabilidad de demostrar que procede la intervención de un tribunal apelativo con un fallo o veredicto condenatorio emitido a nivel de instancia recae, de manera principal, sobre el acusado, y en el caso de autos, no nos convencen los argumentos expresados por el señor Pagán Cruz para revocar la sentencia emitida por el tribunal apelado. Pueblo v. Cabán Torres, 117 D.P.R. 645 (1986). Veamos.
Como ya dijimos, la evidencia que se le presente al juzgador de hechos para probar la culpabilidad de un acusado debe ser suficiente. Esto significa que del análisis de la prueba se desprenda que, de cualquier manera que se interprete la veracidad, los requisitos legales estarán presentes para poder permitir cualquiera de los veredictos posibles. La suficiencia de la prueba requiere que el Estado establezca todos los elementos del delito y la conexión del acusado con éstos. Pueblo v. Colón, Castillo, 140 D.P.R. 564 (1996).
Como es sabido, la evidencia, además de suficiente, debe ser satisfactoria, es decir, que produzca certeza y convicción moral en una conciencia exenta de preocupación. Pueblo v. Colón, Castillo, supra. Esto implica que si la evidencia no es satisfactoria, entonces existe duda razonable en cuanto a la culpabilidad del acusado en relación con el delito del que se le acusa.
En el caso de autos, el señor Pagán Cruz aduce que el Ministerio Fiscal no probó el elemento de premeditación, el cual es imprescindible para que se configure el delito de asesinato en primer grado. El apelante argumenta que, en ausencia de evidencia demostrativa de dicho elemento, procedía condenársele, a lo sumo, por asesinato en segundo grado o asesinato atenuado. No tiene razón.
El Artículo 106 del Código Penal de 2004, supra, establece los grados de asesinato de la siguiente manera:

“Constituye asesinato en primer grado:

(a) Todo asesinato perpetrado por medio de veneno, acecho o tortura o con premeditación.
(b) Todo asesinato que se comete como consecuencia natural de la consumación o tentativa de algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago, envenenamiento de aguas de uso público, agresión grave en su modalidad mutilante, fuga, maltrato intencional o abandono de un menor.
(c) Todo asesinato de un miembro de la Policía, guardia escolar, guardia o policía municipal, alguacil, fiscal, procurador de menores, procurador de familia especial para situaciones de maltrato, juez u oficial de custodia que se encuentre en el cumplimiento de su deber, cometido al consumar, intentar o encubrir un delito grave.
Toda otra muerte intencional de un ser humano constituye asesinato en segundo grado.”
Como se puede apreciar, el aludido cuerpo legal establece cuatro modalidades de asesinato en primer grado: asesinato premeditado; asesinato perpetrado por medio de veneno, acecho o tortura; asesinato estatutario y asesinato de un miembro del sistema de justicia criminal en sus funciones. Toda otra muerte intencional de un ser humano es asesinato en segundo grado.
Tanto el asesinato en primer grado como el de segundo grado, implica la intención y ausencia de justa causa o excusa al ocasionar la muerte. No obstante, para que se configure el asesinato en primer grado se requiere la presencia del elemento de “premeditación”, mientras que en el asesinato en segundo grado, la muerte está ausente de este elemento.” Pueblo v. Negrón, res. el 1 de junio de 2007, 71 D.P.R._(2007), 2007 J.T.S. 109.
Tampoco existe un arrebato de cólera o de súbita pendencia, en cuyo caso estaríamos ante un caso de asesinato atenuado. Art. 108 del Código Penal, 33 L.P.R.A. see. 4736.
El Artículo 14 del Código Penal de 2004, 33 L.P.R.A. sec. 4642(aa), establece que la “premeditación” consiste en la “deliberación previa a la resolución de llevar a cabo el hecho luego de darle alguna consideración por un período de tiempo.” (Enfasis suplido.) Es decir, en el asesinato en primer grado la persona ha decidido matar a otra luego de darle alguna *639 consideración. El Tribunal Supremo ha resuelto que ese lapso de tiempo puede ser tan rápido como el pensamiento. Pueblo v. Rodríguez Vicente, res. el 10 de marzo de 2008, 173 D.P.R._(2008), 2008 J.T.S. 67. De este modo, la “premeditación” constituye un elemento subjetivo que, de ordinario, no puede probarse con evidencia directa por lo que, en ocasiones, es preciso recurrir a los hechos del caso para determinar si de ellos puede razonablemente inferirse. Pueblo v. Rosario, 160 D.P.R. 592 (2003).
Por otro lado, el Artículo 108 del Código Penal, supra, establece, como ya dijimos, que se configura el delito de asesinato atenuado cuando éste tiene lugar en ocasión de súbita pendencia o arrebato de cólera. En estos casos, se le impondrá al convicto la pena provista para el delito grave de tercer grado. Los elementos de este delito son: dar muerte a un ser humano; como consecuencia de súbita pendencia o arrebato de cólera; y causado por una provocación adecuada de la víctima. Pueblo v. Rosario, supra; Pueblo v. Negrón, supra. El asesinato atenuado constituye un acto intencional e ilegal por el cual ocurre una muerte, pero, por circunstancias atenuantes, la calificación del delito y la pena varían para beneficio del acusado. Pueblo v. Rivera Alicea, 125 D.P.R. 37 (1989).
En resumen, para determinar la posible comisión del delito de homicidio (o asesinato atenuado conforme al Código Penal de 2004) hay que identificar, al menos, tres factores. A saber, que la muerte haya ocurrido mientras el actor se encontraba en un arrebato de cólera o pendencia súbita (“heat of passion”); que la muerte estuviere precedida de una provocación adecuada; y que la muerte haya ocurrido antes de que el arrebato o pendencia sufrida por el actor razonablemente se hubiere enfriado (“cooling off period”). Pueblo v. Negrón, supra.
En Pueblo v. Román Marrero, 96 D.P.R. 796 (1968), el Tribunal Supremo expuso que la norma para determinar la aplicabilidad de la doctrina sobre el período de enfriamiento —la cual da margen para reducir el delito de asesinato a homicidio a base de súbita pendencia o arrebato de cólera — , debe ser el período de tiempo que necesitaría una persona ordinaria y razonable situada en circunstancias similares al acusado y no el período de tiempo que necesitaba el acusado para calmarse o enfriarse.
Según los hechos probados por el Ministerio Público durante el juicio del señor Pagán Cruz, la muerte del señor Cáceres Cruz se produjo cuando el apelante le disparó varias veces mientras aquél se encontraba desarmado en el suelo. El señor Pagán Cruz argumenta que su actuación obedeció a un arrebato de cólera que lo llevó a disparar de forma irreflexiva contra su víctima luego que éste lo agrediera. No nos convence su argumento.
Como expusimos anteriormente, al sentirse herido de bala en el muslo, el apelante le disparó varias veces a su víctima. Sin embargo, la evidencia también demostró que después de esto, el acusado hizo una pausa, se acercó a la víctima y le disparó nuevamente. Difícilmente podría argumentarse que esta conducta obedeció a un mero impulso o arrebato de cólera, pues razonablemente puede inferirse que una persona ordinaria por coraje no se acerca a otra, ya herida de bala, desarmada y tirada en el suelo para volverle a disparar.
Tal hecho fue constatado por el testimonio del Dr. Raúl López Menéndez, quien al ser interrogado sobre la conducta mental del acusado, declaró lo siguiente:
“R. [...]
Ocurre el cuarto disparo y después del cuarto disparo ocurre una pausa. En la pausa sucede algo que nos sugiere, desde el punto de vista mental, que ocurren varias decisiones internas en el individuo. De disparar al torso, reenfoca y dispara a la cabeza. En ese momento procede pensar que la, que habría una intención creada en ese momento de no sólo reaccionar a la excitación, sino de producir un resultado final.
Los primeros disparos podrían hasta considerarse fortuito, el último va orientado, dirigido y apuntado a un área vital del cuerpo. Se sabe que el “outcome” de ese tipo de movimiento que ha tardado varios segundos en darse, en ocurrir, implica que hubo un proceso mental que hizo ponderar a este individuo el cambiar la dirección de su pistola para producir un efecto. En este caso, la muerte del acusado, perdón del, de la, del occiso.
P. Le pregunto, los hechos posteriores a, al incidente en que muere el señor Cáceres, ¿qué si algo le indican?
R. Básicamente que el individuo continúa en contacto con la realidad, que toma una serie de medidas para su protección y *640 básicamente se mueve fuera del lugar de los hechos, recibe atención médica. Toda conducta lógica, que es la de una persona que ha sufrido una herida.” (Énfasis nuestro.) Transcripción de la prueba oral, Tomo 16, págs. 148-149.
El señor Pagán Cruz también argumenta que las circunstancias en que ocurrió la muerte del señor Cáceres Cruz no tienden a indicar que el apelante “actuara de manera premeditada, como parte de un plan ideado para dar muerte al occiso”. En cuanto a este aspecto, el Tribunal Supremo ha explicado que la deliberación, ni la malicia premeditada, requieren necesariamente de un plan previo, ni que se conciban por mucho tiempo de antelación a los hechos. De hecho, ambos pueden concebirse en el momento mismo del ataque, no importa la rapidez conque el acto se haya realizado. Pueblo v. Rosario, supra.
Más aún, la forma en que el apelante le dio muerte al señor Cáceres Cruz se ajusta a varias instancias en las cuales el Tribunal Supremo ha reconocido que se puede inferir fácilmente el elemento de malicia premeditada o deliberación en el autor del delito. En Pueblo v. Rosario, supra, el referido foro enumeró algunas de estas situaciones, a saber: el acto de atacar a una persona con una arma mortífera, ya que del uso de la misma, puede inferirse la intención de matar o causar daños cuya consecuencia probable es la muerte; atacar con una arma a una persona desarmada; dispararle a la víctima en más de una ocasión, a corta distancia y alcanzándola en la cara o dispararle a la víctima dos tiros con un arma de fuego y luego acercársele para dispararle tres veces más mientras le dice “para acabar contigo”.
Ciertamente, reiteramos, la forma en que el señor Pagán Cruz le dio muerte al señor Cáceres Cruz denota premeditación y deliberación de su parte. Ello se puede también inferir de la forma en que el acusado actuó inmediato después de dispararle a su víctima, dejando su cuerpo en el suelo sin auxilio alguno, sin siquiera verificar si éste aún respiraba. Cabe señalar que uno de los presentes en el lugar de los hechos el día del incidente, declaró durante el juicio que el señor Cáceres Cruz aún respiraba luego de recibir los impactos de bala que, eventualmente, le provocaron la muerte. Sin embargo, ni el acusado, ni sus dos compañeros agentes, llamaron al servicio de emergencias médicas para que se atendiera la situación.
El señor Pagán Cruz también señala que el foro apelado suprimió indebidamente cierta evidencia exculpatoria, por lo cual procedía la celebración de un nuevo juicio. Esta contención también carece de méritos. Como se sabe, ante un planteamiento de esta índole, procede resolver si en ausencia de la prueba pertinente en cuanto a inocencia o culpabilidad que fue suprimida, el acusado gozó de un juicio justo. Pueblo v. Velázquez Colón, res. el 18 de julio de 2008, 174 D.P.R. _(2008), 2008 J.T.S. 144.
Es decir, debemos determinar si el resultado del juicio que se llevó a cabo contra el señor Pagán Cruz es digno de confianza o, si en cambio, de haber sido presentada la prueba omitida, hubiese arrojado una luz diferente en el juicio al punto de socavar la confianza en el resultado. Es éste, el estándar aplicable para determinar si hay una probabilidad razonable de un veredicto diferente que amerite un nuevo juicio cuando las actuaciones del Estado ocasionan que el acusado no haya tenido acceso a la evidencia durante la etapa del juicio original. Pueblo v. Velázquez Colón, supra.
En su escrito, el señor Pagán Cruz no expone en qué medida la evidencia suprimida incidiría en la determinación de culpabilidad hecha por el TPI. Su alegación de que la entrega tardía de ciertos documentos limitó seriamente su facultad para impugnar a los testigos de cargo, no basta para que podamos concluir que probablemente el resultado de este caso hubiese sido distinto si se hubiese admitido la referida prueba. Por tanto, no procede la celebración de un nuevo juicio por el aludido fundamento.
En conclusión, en el caso ante nos, el Estado probó con evidencia satisfactoria y suficiente cada uno de los elementos del delito de asesinato en primer grado que se le imputó al acusado. Es decir, de cualquier manera en que se interprete la veracidad de la prueba presentada por el Ministerio Público, existió prueba que derrotó la presunción de inocencia que cobijaba al señor Pagán Cruz al establecer los elementos del delito y la conexión del acusado con éstos. Pueblo v. Colón, Castillo, supra. A igual conclusión llegamos en cuanto a la infracción al Artículo 5.15 de la Ley de Armas, supra.
Es norma trillada que en cuanto a la evaluación de la credibilidad de la prueba testifical por parte del juzgador de instancia se refiere, ésta merece gran deferencia y debemos de abstenemos de intervenir en la etapa apelativa con las determinaciones hechas por el foro apelado en ausencia de error manifiesto, prejuicio, parcialidad o pasión. Pueblo v. Acevedo Estrada, 150 D.P.R. 84 (2000). Ello obedece a que es el juzgador de los hechos en instancia quien oye y ve declarar a los testigos y es quien, de ordinario, está en mejor posición para aquilatar la prueba testifical. Pueblo v. Cabán

*641
Torres, supra.

Conforme con lo anterior, a menos que existan los elementos antes mencionados o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, debemos abstenernos de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos. Las determinaciones que éste hace no deben ser descartadas arbitrariamente, ni tampoco deben sustituirse por el criterio del foro apelativo, a menos que de la prueba admitida surja que no existe base suficiente que apoye tal determinación. Pueblo v. Acevedo Estrada, supra.
El señor Pagán Cruz no demostró que en su caso existiese alguno de los elementos antes señalados, por lo cual debemos abstenemos de intervenir con la apreciación de la prueba hecha por el TPI. En el expediente, tampoco existe base alguna que nos lleve a descartar la determinación hecha por el foro a quo, de manera que no debemos sustituirla por nuestro criterio. En consecuencia, no se equivocó el TPI al condenar al apelante a 109 años de prisión por la comisión de los delitos de asesinato en primer grado e infracción al Artículo 5.15 de la Ley de Armas, supra. Ninguno de los errores que se señalan en el recurso de epígrafe se cometió.
III
Por los fundamentos antes expuestos, se confirma la sentencia apelada.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones